[No. D060779. Fourth Dist., Div. One. Jan. 31, 2013.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL POULSOM, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts IV and V.

502

506

**COUNSEL**

Laurel M. Nelson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lilia E. Garcia and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**HUFFMAN, J.**—In 2007, a jury found that Michael Poulsom did not qualify as a sexually violent predator (SVP) within the meaning of the Sexually Violent Predators Act (the Act or SVPA). (Welf. & Inst. Code,[1] §6600 et seq.) After two subsequent parole violations, the San Diego County District Attorney filed a petition alleging that Poulsom was an SVP under the Act. The jury found the petition's allegations true and the trial court ordered Poulsom committed to Coalinga State Hospital for an indefinite term. Poulsom timely appealed the order.

Poulsom raises multiple issues on appeal. He contends that substantial evidence does not support the court's determination that probable cause existed for this matter to proceed to trial. In addition, he argues that substantial evidence does not support either of the jury's findings of (1) a changed material circumstance after the jury found him not to qualify as an SVP in 2007 or (2) Poulsom's current difficulty controlling his criminal sexual behavior. Poulsom also argues his due process rights were violated because the court limited his number of peremptory challenges to six. He next asserts that his commitment to an indeterminate term under the Act violates his equal protection rights. Finally, Poulsom contends the trial court erroneously instructed the jury.

We conclude none of Poulsom's contentions has merit and affirm the order. We determine substantial evidence supports both the jury's finding of a material change in circumstance and its true finding that Poulsom qualifies as an SVP under the Act. We also conclude that neither Poulsom's due process rights nor his equal protection rights have been violated. In addition, we find no instructional error.

We publish a portion of this opinion to address a few issues. First, we clarify our holding in *Turner v. Superior Court* (2003) 105 Cal.App.4th 1046, 1060 [130 Cal.Rptr.2d 300] (*Turner*) on which Poulsom heavily relies in arguing the jury's finding of material changed circumstances since Poulsom's 2007 trial is not supported by substantial evidence. As we discuss in more detail below, in *Turner*, we did not list the types of facts that are required to support a change in circumstance. Instead, we determined that the People must show, usually through their expert witnesses, what has changed since the last trial and how those changes prove the defendant is likely to reoffend. (*Ibid.*)

Second, we publish our discussion of Poulsom's posttrial challenge of the court's finding of probable cause to remind defendants that the proper

---

[1] Statutory references are to the Welfare and Institutions Code unless otherwise specified.

procedure for challenging a probable cause determination based on a lack of evidence is through a petition for writ of habeas corpus. If a defendant waits to challenge a court's probable cause finding for insufficient evidence until after trial, then we will only review his claim under a harmless error standard. Because the People's burden of proof is higher at trial than the burden guiding a court in determining if probable cause exists, it is highly unlikely that any posttrial attack on a probable cause determination based on substantial evidence will be successful if brought, in the first instance, on appeal after the jury's true finding.

Finally, we publish our discussion of Poulsom's claim that he was entitled to 20 peremptory challenges. In concluding his claim lacks merit, we follow the holding of *People v. Calhoun* (2004) 118 Cal.App.4th 519 [13 Cal.Rptr.3d 166] (*Calhoun*).

## FACTUAL AND PROCEDURAL HISTORY

### The People's Case

#### First Predicate Act and Conviction (1985 Offense)

In 1984, Poulsom worked as a correctional officer in Georgia. His wife, whom he married in 1982 after knowing her for only a week, had two children, an infant and a two year old. During his time off from work, Poulsom babysat his wife's children and her nieces, C.S., age eight, and P.K., age nine. On multiple occasions, Poulsom molested C.S. and P.K. Poulsom put his hands down the girls' pants, orally copulated them, digitally penetrated them, and forced them to have sexual intercourse with him. Poulsom once threatened to hit one of the girls with a belt if she did not comply.

In 1985, Poulsom was arrested and ultimately convicted in Montgomery County, Georgia, by way of plea bargain, of an offense that is the equivalent of committing lewd and lascivious acts on a child under the age of 14. Poulsom was sentenced to five years in prison. He served two years in custody and the remaining three years under conditional release.

#### Second Predicate Act and Conviction (1989 Offense)

Poulsom separated from his wife after the 1985 offense and moved to San Diego. One night, Poulsom went into his daughter[2] C.P.'s bedroom, lay on her bed, removed her underpants, got on top of her, and orally copulated

---

[2] The record refers to C.P. as Poulsom's daughter. There is no discussion of C.P.'s mother or any additional background information regarding C.P.

her. C.P. asked Poulsom to stop because he was hurting her. C.P. finally managed to get away from Poulsom. She ran into the kitchen and hid in a cupboard until her mother came home. Later that evening, Poulsom went back into her bedroom, kneeled by her bed, and masturbated until he ejaculated. On two other occasions, Poulsom touched C.P.'s vagina. C.P. was seven years old at the time of the incidents.

On October 13, 1989, Poulsom was convicted in San Diego County Superior Court, by way of plea bargain, of committing lewd and lascivious acts on a child under the age of 14. The court sentenced Poulsom to prison for eight years.

### Third Predicate Act and Conviction (1995 Offense)

Shortly after his release from prison for the 1989 offense, Poulsom started dating a woman with a five-year-old daughter, J.A. Although Poulsom told his girlfriend he was on parole for a narcotic offense, the woman asked Poulsom to babysit J.A. after she noticed a lot of children interacting with Poulsom. During the two weeks he acted as a babysitter, Poulsom repeatedly removed J.A.'s clothes and inserted his finger into her vagina. He moved his fingers around while ordering J.A. to sit still. Poulsom told J.A. not to say anything.

On June 30, 1995, Poulsom was convicted in San Diego County Superior Court, by way of plea bargain, of committing lewd and lascivious acts on a child under the age of 14. The court sentenced Poulsom to prison for 15 years.

### Parole Violations

On August 7, 2007, Poulsom was released on parole after serving his sentence for the 1995 offense. Poulsom signed conditions of parole, which included a requirement that he "not be within 100 yards of the perimeter of places where children congregate (schools, parks, playgrounds, video arcades, swimming pools, etc.) without DAPO [(Dept. of Adult Parole Operations)] approval." Matthew Holmes was Poulsom's parole agent. Holmes told all of his parolees, "If you have any doubt in your mind whether or not you're supposed to be doing [something] or allowed to be doing [something], call first and ask permission."

On August 20, 2007, Holmes reviewed information from Poulsom's global positioning system ankle monitor (GPS). It showed that on Saturday, August 18, Poulsom was at Wells Park in El Cajon from 10:01 a.m. to 10:14 a.m. Holmes never received a call from Poulsom notifying him Poulsom was there. Holmes went to the area to investigate. The park was in the middle of a

residential area. The park had softball fields, basketball courts, and a playground. A Boys and Girls Club and a parking lot were adjacent to the park. There were two Boys and Girls Club signs—a large banner on top of the building and a small one attached to the side. The signs were clearly visible from the one entrance to the facility.

After speaking with his supervisor, Holmes instructed Poulsom to report to the parole office. He asked Poulsom why Poulsom was at the park. Poulsom said that he was there for a lightbulb exchange hosted by SDG&E (San Diego Gas and Electric Company) and that he stayed in the car. He said he noticed the park, but not the Boys and Girls Club. Holmes asked Poulsom why he had not called with any concerns about being in a park. Poulsom said he thought about calling, but decided against it. Holmes took Poulsom into custody for violating parole. Poulsom served a 10-month sentence for the violation.

On November 3, 2009, William Erholtz, owner of a small business known as E.R. Designs, hired two workers through Labor Ready to do some work for him. Poulsom was one of the workers. The work was near the Samburu playground and terrace of the San Diego Wild Animal Park[3] and consisted of placing shade cloths over play structures and statues in a children's play area. A nearby sign said, "Caution: Play surfaces can be hot during high temperature days." The work was close to a lunch area, which was open. The workers put up a temporary barricade between themselves and the public, which consisted of 3.5-foot poles, wired together. Six inches of space separated each pole. Occasionally, a parent approached the workers, and asked them what they were doing and when they would finish.

The work started at around 7:30 or 8:00 a.m. and ended at 4:00 p.m. The workers entered through the guard shack at the back entrance. They passed signs which read, "Samburu Jungle Gym," "San Diego Wild Animal Park Service and Deliveries," and "Elephant Overlook, Tiger Gardens." They also passed a picture of an elephant, a couple of animal exhibits, and a balloon ride. Poulsom never told Erholtz he was a sex offender, was not allowed in the area, or had to leave because it was a prohibited location.

At the time, Robert White was Poulsom's parole agent. Poulsom wore a GPS device that he was required to charge for one hour every 12 hours. Poulsom failed to properly charge the device on April 13, 2009, May 2, 2009, August 17, 2009, September 8, 2009, September 15, 2009, October 13, 2009, and November 3, 2009. As a consequence, White was unable to properly monitor Poulsom's location.

---

[3] The San Diego Wild Animal Park has since changed its name to the San Diego Zoo Safari Park. For convenience and consistency, we use the name "Wild Animal Park" throughout this opinion.

The afternoon of November 3, White was in the field conducting routine home visits. He checked Poulsom's GPS tracks to see if Poulsom was home. The GPS tracks showed that Poulsom was inside the Wild Animal Park, a prohibited area. White signaled Poulsom's GPS, telling Poulsom to call him, which Poulsom did, sometime between 2:30 and 3:00 p.m. White asked Poulsom where he was. Poulsom said he was working for Labor Ready at a jobsite in Escondido, digging trenches and laying concrete pipe. Poulsom said he thought he was at a private residence just outside of Escondido. White asked Poulsom to be more specific about his location. Poulsom said he would have to get the address from his employer, and he would give it to White the following day. White looked at an aerial map and saw that Poulsom was clearly inside the Wild Animal Park.

White told Poulsom to report immediately to the Escondido parole office and gave him directions. Instead of reporting, Poulsom returned to Labor Ready in El Cajon, picked up his paycheck, deposited it in the bank, and then drove to Escondido. Poulsom arrived at the parole office after 5:00 p.m. Poulsom told White he was at a jobsite through Labor Ready and did not know where he was.

White found it difficult to believe Poulsom could drive through the elephant enclosure and past the Wild Animal Park signs without knowing his location. Moreover, Poulsom had White's cell phone number and never called to see if he could remain on site once he discovered where he would be working.

*Expert Testimony*

Psychologist Dawn Starr, Ph.D., believed that Poulsom met the SVP commitment criteria. She diagnosed Poulsom with pedophilia, nonexclusive type, because over a period of at least six months, Poulsom had recurrent, intense, sexually arousing fantasies, urges, or behaviors toward children under age 13. Starr concluded that because of Poulsom's mental disorder, he presented a serious and well-founded risk of committing future sexually violent predatory acts. Starr testified that none of the "protective factors" that would decrease risk existed in Poulsom's case. Specifically, Poulsom was never in the community for more than a year without a new offense. Poulsom did not have serious medical problems, and Poulsom was under the age of 70. Moreover, given Poulsom's history of dishonesty and manipulative behavior, he would not follow through with voluntary outpatient sex offender treatment.

In Starr's opinion, Poulsom had serious difficulty controlling his behavior. She noted that when she spoke to Poulsom about molesting his daughter, he said he was glad he got caught, because if it was not her, it would have been someone else. He also said that before he touched her, he had fantasies about

doing so. Poulsom went to a sex offender treatment program for two or three months as a condition of his 2007 parole. Starr asked Poulsom what he learned from treatment, and Poulsom could not articulate anything in particular. Poulsom told Starr he did not have the ability or desire to attend further sex offender treatment. Moreover, despite the consequences of his conduct (i.e., incarceration), Poulsom committed repeated offenses. Poulsom gave several reasons why he molested girls, telling Starr that they have "soft little bodies," he was "curious," he acted on "impulse" or "opportunity," and he wanted "self-gratification." At one point he blamed his victims, claiming they put his hands down their pants.

Poulsom also told Starr he tried to ignore his thoughts about girls, but realized he could not do that; he had to address or otherwise deal with them. Poulsom felt his time in custody for the parole violations should be short, if at all. In connection with the 1995 offense, Poulsom admitted he was sexually aroused and had an erection.

Starr also testified that Poulsom's wife, Sonja, who married him after he was incarcerated for the 1995 offense, was not likely to recognize his risk for sexual reoffense or help lower it. On the contrary, she enabled Poulsom to be in situations where he was likely to reoffend and made excuses for Poulsom. For instance, when Starr interviewed Poulsom about the 2007 parole violation, Poulsom said he was with Sonja. They realized they were near a park and should call Poulsom's parole agent, but they both forgot.

Starr opined that Poulsom's circumstances had changed since the 2007 jury verdict finding him not to be an SVP. In 2007, Poulsom went to a lightbulb exchange. The exchange was next to a Boys and Girls Club and a park. There was a large sign outside of the club. Poulsom told Starr he thought no children were there. Starr found this highly unlikely given the fact Poulsom was there on a Saturday morning. Poulsom then failed to report the violation to his parole agent.

Then, on November 3, 2009, Poulsom violated parole again by working at the Wild Animal Park. During his interview with Starr, Poulsom claimed the park was expanding and they were putting up posts for a new animal exhibit so the animals would have shade. Starr asked Poulsom if he went through the park. Poulsom said that was the only way to get to the jobsite.

Starr noted that both violations involved Poulsom placing himself in situations where there was a high probability he would have contact with children. Starr believed Poulsom should have contacted his parole agent and left the locations immediately. When Starr asked Poulsom why he did not leave the locations, he had no explanation. Moreover, as to the 2009 incident,

Starr was troubled that Poulsom took three hours to report to the parole office and showed up after it was closed, despite instructions to report immediately. Poulsom also had a history of failing to charge his GPS, leaving his parole agent without the ability to track him.

Psychologist Robert M. Brook, Ph.D., also evaluated Poulsom. He diagnosed Poulsom with pedophilia, nonexclusive type, because Poulsom had sexual fantasies about children under age 13 that had lasted at least six months. Brook opined that Poulsom's mental disorder predisposed him to commit future crimes, i.e., it caused volitional impairment. Poulsom had repeatedly committed sexual offenses and possessed limited insight into his behavior. He had opportunities to correct what he was doing, but chose not to do so. At the time of his crimes, he had age-appropriate, consenting sex partners, but opted to prey on young girls. He dropped out of sex offender treatment and refused to further pursue treatment. He told one evaluator he dropped out because he did not want to confront his feelings. He also said he had no need for treatment. His lack of control was further demonstrated by his statement that if his daughter had not been available to molest, he would have found someone else. In 2006, Poulsom said that if he could have sex as often as he wanted, he would have it every day. Brook explained that higher sexual drive increases one's risk to molest again. Poulsom had difficulty describing the adverse effects of his conduct on the victims.

Poulsom estimated his risk of reoffense at "zero." Brook explained if a pedophile does not recognize at least some risk, he will not avoid situations which might be triggers for new crimes. Poulsom told one evaluator he needed to stay away from places where children congregate, such as parks, yet told another he likes to walk in the park.

Lastly, Brook considered the change in Poulsom's circumstances since the 2007 jury's not true finding. Brook was concerned that Poulsom had two parole violations centered on issues relating to sexual molestation: he was in areas frequented by children. In 2007, a short time after his release from prison, he went with his wife and her daughter to a lightbulb exchange at a park. He did not need to be there; his wife and her daughter could have participated in the exchange without him. He then did not report the event to his parole agent. He admitted he thought he should, but claimed he forgot. Brook noted that this violation represented high-risk behavior close to the time Poulsom was released from prison.

Brook also based his belief of changed circumstances on the 2009 parole violation. Brook was concerned by Poulsom's reaction to his work assignment at the Wild Animal Park. Poulsom's parole agent told him that when he finished work at 3:00 p.m., he should report. Poulsom instead arrived at 6:00

p.m., after the parole office was closed. Poulsom claimed he did not have transportation because his car was in El Cajon. However, once in El Cajon, Poulsom went to pick up a paycheck and then went to the bank. According to the parole agent, Poulsom never called and explained why he would be late. Poulsom lied during his interview with Brook, claiming he called at 4:30 p.m. Brook noted that when told to report, Poulsom could have taken a taxi, asked for a ride, or called his parole agent and requested transportation. By being at the Wild Animal Park, Poulsom was in obvious violation of the conditions of his parole.

Brook noted that Poulsom also violated parole several times by failing to properly charge his GPS device. On each occasion, his parole agent could not track Poulsom's location. Brook explained that his opinion regarding changed circumstances was based not on the parole violations alone, but rather on the conduct which led to them. The violations showed Brook that Poulsom does not pay attention to very important guidelines. Also, Brook stated Poulsom was evasive and put himself in risky situations. Brook explained that a lack of cooperation with supervision (as shown by Poulsom) is a factor which is recognized as being related to the risk of reoffense.

Defense

*Parole Violations*

According to Poulsom's stepdaughter, Rebecca Alexander, and his wife, Sonja Poulsom, Alexander received a flyer in the mail from SDG&E. The flyer advertised an event in El Cajon at which SDG&E would be providing free energy efficient lightbulbs and lamps, and a discount on the electric bill, for any income-qualifying person who brought in older lamps and lightbulbs to the exchange. Alexander told Poulsom and Sonja about the lightbulb exchange program, and they all agreed to go to the exchange.

Sonja drove to the exchange with Poulsom while Alexander drove herself. Alexander arrived at the event at around 10:00 a.m. She got in line for the exchange. Shortly thereafter, Poulsom and Sonja arrived. There was no place to park, so Poulsom dropped off Sonja and looked for a parking spot. Meanwhile, Sonja got in line with Alexander. As they finished, they saw Poulsom walking toward them. They got into their respective cars and left. Alexander acknowledged that she saw a soccer field in the area, but denied seeing any children. Sonja testified she did not see a park or any signs for the Boys and Girls Club.

Thomas Deming, branch manager for Labor Ready, testified that Poulsom started working for the company on September 29, 2008. Poulsom was in the

company's top 10 percent of workers. Deming knew that Poulsom could not work in places where children congregate. Whenever Deming had a job for Poulsom, or any other worker, he would offer the worker the job and the worker would choose whether or not to accept it. He advised Poulsom that sometimes workers were transported to a secondary jobsite and told Poulsom he could call if there were ever any problems.

On November 3, 2009, Deming sent Poulsom to a job for E.R. Designs in Santee. The job order indicated the jobsite would be located at 9435 Wheatlands Court, suite I, in Santee. The requested work was digging holes and laying pipe. Nothing in the job order indicated the work was actually at the Wild Animal Park, and Deming did not know Poulsom would be going there.

### Expert Testimony

Mary Jane Adams, Ph.D., a licensed clinical psychologist, testified that in her opinion, while Poulsom was a child molester, he did not suffer from pedophilia. She considered Poulsom to be "relatively normal." She noted that Poulsom did not seek out children, rather his offenses were "opportunistic." He did not work or engage in activities that would place him around children.

He appeared remorseful for his crimes. His wife was meeting his emotional needs, and he had no prior criminal record. Although Adams did not know what motivated Poulsom to commit his offenses, she speculated that he might have been raised in a very restrictive religious environment where sexuality was not openly discussed. Poulsom's parole violations did not change her opinion.

Hy Malinek, Ph.D., another licensed clinical psychologist, testified there was no material change in Poulsom's circumstances since his jury trial in 2007. The 2007 parole violation was not "purposeful." Rather, Poulsom thought he was going to a lightbulb exchange. And, for most of the time, his wife and stepdaughter were with him. Further, Poulsom had never molested a stranger. Discussing the 2009 parole violation, Malinek noted that someone else drove Poulsom there and reoffense did not appear imminent. Finally, Poulsom had complied with other parole conditions, in that he had registered as a sex offender, obtained a steady residence, and found employment.

### DISCUSSION

### I

### OVERVIEW OF THE ACT

█ The Act, which took effect in 1996 and is set forth in section 6600 et seq. (Stats. 1995, ch. 763, § 3, p. 5922), provides for the involuntary civil

commitment in the custody of the State Department of State Hospitals, formerly the State Department of Mental Health (DMH) of those persons identified as SVP's before they have completed their prison or parole revocation terms. (*Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1142–1144 [81 Cal.Rptr.2d 492, 969 P.2d 584] (*Hubbart*).) In *Hubbart*, the California Supreme Court explained that in describing the underlying purpose of the Act, "the Legislature expressed concern over a select group of criminal offenders who are extremely dangerous as the result of mental impairment, and who are likely to continue committing acts of sexual violence even after they have been punished for such crimes. The Legislature indicated that to the extent such persons are currently incarcerated and readily identifiable, commitment under the SVPA is warranted immediately upon their release from prison. The Act provides treatment for mental disorders from which they currently suffer and reduces the threat of harm otherwise posed to the public. No punitive purpose was intended. [Citation.]" (19 Cal.4th at pp. 1143–1144, fn. omitted.)

■ "The requirements for classification as [an SVP] are set forth in section 6600, subdivision (a) and related provisions." (*Hubbart, supra,* 19 Cal.4th at p. 1144.) To prove that a defendant is an SVP, the People must establish (1) he has been convicted of a "sexually violent offense[4] against one or more victims"; (2) he has a "diagnosed mental disorder";[5] and (3) the mental disorder makes it "likely" that, if released, he will engage in "sexually violent criminal behavior." (§ 6600, subd. (a)(1); see *Hubbart, supra,* at pp. 1144–1145.)

■ The process for determining whether a convicted sex offender meets the requirements for classification as an SVP under the Act "takes place in several stages, both administrative and judicial." (*Hubbart, supra,* 19 Cal.4th at p. 1145.) Generally, the Department of Corrections and Rehabilitation and the Board of Parole Hearings screen inmates in the custody of the department who are "serving a determinate prison sentence or whose parole has been revoked" at least six months before their scheduled date of release from prison. (§ 6601, subds. (a)(1), (b).) "This process involves review of the inmate's background and criminal record, and employs a 'structured screening instrument' developed in conjunction with the [DMH]. [Citation.] If

---

[4] The SVPA defines the term "sexually violent offense" to mean certain enumerated sex crimes "committed by force, violence, duress, menace, [or] fear of immediate and unlawful bodily injury on the victim or another person." (§ 6600, subd. (b).) The enumerated sex crimes include lewd or lascivious acts upon a child under the age of 14 years in violation of Penal Code section 288, subdivision (a), and oral copulation in violation of Penal Code section 288a.

[5] The term "diagnosed mental disorder," as defined by the Act, means "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (§ 6600, subd. (c).)

officials find the inmate is likely to be an SVP, he is referred to the [DMH] for a 'full evaluation' as to whether he meets the criteria in section 6600." (*Hubbart, supra*, 19 Cal.4th at p. 1145.)

 When the full evaluation reveals the inmate has suffered the required qualifying prior convictions of a sexually violent offense against one or more victims (§ 6600, subds. (a)(1) & (2), (b)) and two licensed psychologists and/or psychiatrists agree the inmate "has a diagnosed mental disorder so that he or she is likely to engage in acts of sexual violence without appropriate treatment and custody" (§ 6601, subd. (d)), the DMH "shall" forward a request for a petition for commitment under the Act, with copies of the evaluation reports and other supporting documents, to the county in which the alleged SVP was last convicted (§ 6601, subds. (d), (h)). If the county's designated attorney concurs in the request, a petition for commitment is filed in that county's superior court. (§ 6601, subd. (i).)

 Once the commitment petition is filed, the court holds a probable cause hearing to "determine whether there is probable cause to believe that the individual named in the petition is likely to engage in sexually violent predatory criminal behavior upon his or her release." (§ 6602, subd. (a).) If such probable cause is found, the judge "shall" order that a trial be conducted "to determine whether the person is, by reason of a diagnosed mental disorder, a danger to the health and safety of others in that the person is likely to engage in acts of sexual violence upon his or her release." (*Ibid.*) The trier of fact must unanimously determine beyond a reasonable doubt whether the person named in the petition is in fact an SVP. (§§ 6603, subd. (f), 6604.) Either party may request a trial by jury. (§ 6603, subds. (a), (b).)

If the person is determined to be an SVP, he or she shall be committed to the custody of the DMH for an indeterminate term "for appropriate treatment and confinement in a secure facility" (§ 6604), subject to annual review to consider whether the person currently meets the definition of an SVP and whether conditional or unconditional release is in the person's best interest and conditions could be imposed that adequately protect the community (§ 6605, subd. (a)).

## II

### *SUBSTANTIAL EVIDENCE*

To commit Poulsom as an SVP, the jury had to find that Poulsom was convicted of a violent sexual offense, he suffered from a mental disorder affecting his volitional or emotional capacity, and the disorder rendered him a · danger to others because he was likely to engage in sexually violent criminal

behavior. (§ 6600, subd. (a); *People v. Hurtado* (2002) 28 Cal.4th 1179, 1187–1188 [124 Cal.Rptr.2d 186, 52 P.3d 116].) Moreover, because the jury at Poulsom's previous SVP trial in 2007 did not make those findings and he was released on parole, the jury in this case also had to find that circumstances had materially changed since the 2007 trial and made Poulsom likely to reoffend if released from custody. (*Turner, supra*, 105 Cal.App.4th at p. 1060.)

Here, Poulsom asserts that there is insufficient evidence of changed circumstances to support the court's finding of probable cause and the jury's true finding. He also claims there is insufficient evidence that his disorder would render him a danger to others.

In reviewing the sufficiency of the evidence to support a person's civil commitment as an SVP, we apply the substantial evidence standard of review. (*People v. Mercer* (1999) 70 Cal.App.4th 463, 465–466 [82 Cal.Rptr.2d 723] (*Mercer*).) "Under this standard, the court 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] The focus of the substantial evidence test is on the whole record of evidence presented to the trier of fact, rather than on ' "isolated bits of evidence." ' " (*People v. Cuevas* (1995) 12 Cal.4th 252, 260–261 [48 Cal.Rptr.2d 135, 906 P.2d 1290], italics omitted.)

We "must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314 [270 Cal.Rptr. 611, 792 P.2d 643].) "We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor . . . ." (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660 [190 Cal.Rptr. 355, 660 P.2d 813].) Further, "[a]lthough we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." (*Jones, supra*, at p. 314.) This is true even in the context of expert witness testimony. "The credibility of the experts and their conclusions [are] matters [to be] resolved . . . by the jury," and "[w]e are not free to reweigh or reinterpret [that] evidence." (*Mercer, supra*, 70 Cal.App.4th at pp. 466–467.)

## A. Material Change in Circumstances

Because the jury did not find Poulsom was an SVP at trial in 2007, the People had the burden to prove circumstances had materially changed since the trial, and because of this change, Poulsom was likely to reoffend if released from custody. (*Turner, supra,* 105 Cal.App.4th at p. 1060.) Poulsom claims there is insufficient evidence of any changed circumstances. He makes this claim on two fronts, first challenging the court's probable cause determination, and second, the jury's true finding.

### 1. *Probable Cause*

■ At a probable cause hearing, the superior court must "determine whether a reasonable person could entertain a strong suspicion that the petitioner has satisfied all the elements required for a civil commitment as an SVP, specifically, whether (1) the offender has been convicted of a qualifying sexually violent offense against at least two victims; (2) the offender has a diagnosable mental disorder; (3) the disorder makes it likely he or she will engage in sexually violent criminal conduct if released; and (4) this sexually violent criminal conduct will be predatory in nature." (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 236 [127 Cal.Rptr.2d 177, 57 P.3d 654], italics omitted (*Cooley*).) Here, where a jury previously did not find Poulsom qualified as an SVP, the court also must determine if the petitioner can show that circumstances had materially changed since the previous trial and these circumstances show that Poulsom is likely to reoffend if released from custody. (*Turner, supra,* 105 Cal.App.4th at p. 1060.)

■ The probable cause hearing is "a full, adversarial preliminary hearing." (*People v. Munoz* (2005) 129 Cal.App.4th 421, 429 [28 Cal.Rptr.3d 295].) The hearing "allow[s] the admission of both oral and written evidence" on the issue of probable cause. (*In re Parker* (1998) 60 Cal.App.4th 1453, 1469 [71 Cal.Rptr.2d 167]; see *Cooley, supra,* 29 Cal.4th at p. 245, fn. 8.) The scope of the probable cause hearing mirrors the scope of the trial. As such, the court "conducting the probable cause hearing must review all necessary elements of an SVP determination and conclude there is probable cause as to each element." (*People v. Hayes* (2006) 137 Cal.App.4th 34, 43 [39 Cal.Rptr.3d 747], italics omitted (*Hayes*); see *Cooley, supra,* at pp. 246–247.) "Like a criminal preliminary hearing, the only purpose of the probable cause hearing is to test the sufficiency of the evidence supporting the SVPA petition." (*Cooley,* at p. 247.)

Here, the court found probable cause and ordered the matter to proceed to trial. Poulsom now challenges the court's conclusion, asserting there was insufficient evidence of changed circumstances. He does not question the court's probable cause finding on any other ground.

Poulsom failed to seek pretrial review of the court's ruling on probable cause. Instead, the matter proceeded to trial, and the jury found Poulsom to be an SVP. Only after the jury's finding did Poulsom challenge the probable cause determination.

██ The appropriate mechanism to challenge a probable cause finding under the Act is a petition for a writ of habeas corpus. (*People v. Talhelm* (2000) 85 Cal.App.4th 400, 404–405 [102 Cal.Rptr.2d 150] (*Talhelm*); cf. *In re Wright* (2005) 128 Cal.App.4th 663, 673 [27 Cal.Rptr.3d 281]; *In re Parker, supra*, 60 Cal.App.4th at p. 1460.) Here, Poulsom did not file any such petition.

Courts typically treat a probable cause hearing under the Act like a preliminary hearing in criminal cases. (See *In re Parker, supra*, 60 Cal.App.4th at p. 1468.) "[I]rregularities in the preliminary examination procedures which are not jurisdictional in the fundamental sense shall be reviewed under the appropriate standard of prejudicial error and shall require a reversal only if defendant can show that he was deprived of a fair trial or otherwise suffered prejudice as a result of the error at the preliminary examination." (*People v. Pompa-Ortiz* (1980) 27 Cal.3d 519, 529 [165 Cal.Rptr. 851, 612 P.2d 941] (*Pompa-Ortiz*).) Thus, irregularities in the probable cause hearing under the Act are subject to harmless error review as well.

We will not reverse a judgment or order based on an alleged error during the probable cause hearing unless the appellant makes a showing that he was denied a fair trial or otherwise suffered prejudice. (See *Hayes, supra*, 137 Cal.App.4th at p. 49 [probable cause hearing held at the conclusion of trial was harmless error]; *People v. Butler* (1998) 68 Cal.App.4th 421, 435 [80 Cal.Rptr.2d 357] (*Butler*) [failure to hold a full evidentiary hearing to determine probable cause was harmless error]; cf. *In re Wright, supra*, 128 Cal.App.4th 663, 672–673 [in the context of evaluating appellant to determine if he was an SVP, the fact that one of the evaluating doctors did not possess a doctorate in psychology as required under § 6601, subd. (g) was harmless error].)

In *Talhelm, supra*, 85 Cal.App.4th 400, the appellant filed a petition for writ of habeas corpus in superior court, alleging there was insufficient evidence to support the trial court's finding of probable cause under the Act. (85 Cal.App.4th at p. 404.) The superior court summarily denied the petition, reasoning that the appropriate procedure to challenge an adverse determination of probable cause was by a motion under Penal Code section 995. (*Talhelm, supra*, at p. 404.) The case proceeded to trial, and the jury found the appellant was an SVP. (*Id.* at p. 403.) The Court of Appeal agreed with the appellant that the appropriate procedure to challenge a probable cause finding under the Act is a writ of habeas corpus, not a Penal Code section 995

motion. (*Talhelm, supra,* at p. 404.) Nevertheless, the court applied a harmless error standard and determined the appellant received a fair trial and suffered no prejudice. (*Id.* at p. 405.)

There is no indication that the appellant in *Talhelm, supra,* 85 Cal.App.4th 400 asked the Court of Appeal to analyze his substantial evidence challenge on the merits. Instead, the appellant argued that the superior court's summary dismissal of his petition was reversible error per se. (*Id.* at p. 405.) The court disagreed, found no prejudice, and determined reversal was unwarranted. (*Ibid.*) The court did not substantively address the appellant's insufficient evidence claim. Nor did it remand the case to the superior court with instructions to evaluate the sufficiency of the evidence.

Unlike the appellant in *Talhelm, supra,* 85 Cal.App.4th 400, Poulsom requests that we evaluate his claim of insufficient evidence on the merits. In other words, he asks us to engage in a substantial evidence review of the finding of probable cause.

We are mindful that the other courts addressing posttrial attacks on a probable cause determination in an SVP matter have applied a harmless error standard of review. (See *Hayes, supra,* 137 Cal.App.4th at p. 49; *Talhelm, supra,* 85 Cal.App.4th at p. 405; *Butler, supra,* 68 Cal.App.4th at p. 435.) Applying this standard here, Poulsom cannot show prejudice merely by claiming he should not have been compelled to participate in a fair trial. (*In re Wright, supra,* 128 Cal.App.4th at pp. 673–674; see *Pompa-Ortiz, supra,* 27 Cal.3d at pp. 529–530.) And he does not argue his trial was unfair based on the probable cause determination. Poulsom was represented by counsel at trial, presented his own expert witnesses, and cross-examined the People's witnesses.

■ The only prejudice Poulsom could argue that resulted from a finding of probable cause based on insufficient evidence is if the jury found Poulsom to be an SVP on the same insufficient evidence. However, certain safeguards make such a result unlikely. As we discuss above, the purpose of the probable cause hearing is to test the sufficiency of the evidence supporting the petition under the Act. (*Cooley, supra,* 29 Cal.4th at p. 247.) To this end, the court will only find probable cause if it determines "a reasonable person could harbor a strong suspicion of the defendant's guilt, i.e., whether such a person could reasonably weigh the evidence, resolve conflicts, and give or withhold credence to particular witnesses in favor of harboring such a suspicion." (*Id.* at pp. 251–252, italics omitted.) Once the case proceeds to trial, however, the burden of proof is on the People to show that the person is an SVP "beyond a reasonable doubt." (§ 6604.) Therefore, the increased burden of proof protects a defendant from a true finding based on evidence that would be insufficient

to support a probable cause finding. Moreover, if a defendant believes the evidence supporting the jury's true finding is insufficient, he can raise the issue on appeal. Here, this is precisely what Poulsom did, essentially rendering his probable cause challenge moot.

Poulsom has not indicated any significant difference in the evidence offered at the probable cause hearing and at trial. Because the burden of proof is more difficult to satisfy at trial, if we determine substantial evidence supports the jury's finding then it logically follows the same evidence would be more than sufficient for the lesser burden of proof the court applied in finding probable cause. Also, even if the evidence used at trial differed significantly from what was presented at the probable cause hearing, we still would not find error unless the trial evidence was insufficient to support the jury's true finding. As such, because we determine substantial evidence supports the jury's true finding as discussed below, Poulsom has not shown he was prejudiced by any irregularity at the probable cause hearing.[6]

## 2. Evidence of Changed Circumstances at Trial

Poulsom asserts there was insufficient evidence of material changed circumstances presented at trial. We disagree.

Here, both Starr and Brook testified that circumstances had materially changed since the 2007 jury verdict finding Poulsom not to be an SVP. Starr noted that both of Poulsom's violations involved Poulsom placing himself in situations where there was a high probability he would have contact with children. Starr stated that Poulsom should have contacted his parole agent and left the locations immediately. Starr was troubled by Poulsom's lack of explanation for failing to leave the two locations immediately. Starr also testified he was concerned that, during the 2009 incident, Poulsom took three hours to report to the parole office and showed up after it was closed, despite instructions to report immediately. In addition, Starr mentioned Poulsom's history of failing to charge his GPS, leaving his parole agent without the ability to track him.

Like Starr, Brook testified the two parole violations after the 2007 trial contributed to his opinion there had been a material change in circumstances.

---

[6] We struggle to contemplate a situation in which we would entertain a substantial evidence review of a probable cause determination after trial when the jury found the defendant to be an SVP and that finding is supported by substantial evidence. Therefore, a defendant who wishes to challenge the sufficiency of the evidence supporting a probable cause determination should file a petition for a writ of habeas corpus prior to trial. If he does not do so, he effectively forfeits his insufficient evidence challenge to the probable cause determination. Of course, the defendant still could challenge the sufficiency of the evidence supporting the jury's true finding.

Brook stated that Poulsom's two parole violations centered around issues relating to sexual molestation because he was in areas frequented by children. In regard to the 2007 violation, Brook noted that there was no reason for Poulsom to have been at the park. His wife and stepdaughter could have participated in the exchange without him. Brook was concerned that Poulsom did not report the 2007 event to his parole agent. Brook further testified that this violation represented high-risk behavior close to Poulsom's release from prison.

In regard to the 2009 violation, Brook was concerned that Poulsom did not leave the Wild Animal Park upon realizing his job was there and he did not report to the parole office when told to do so. During his interview with Poulsom about the 2009 violation, Brook testified that Poulsom lied to him.

Like Starr, Brook noted that Poulsom also violated parole several times by failing to properly charge his GPS device. Brook explained that his opinion regarding changed circumstances was based not on the parole violations alone, but also on the conduct which led to them. Brook opined that the violations show Poulsom does not pay attention to very important guidelines. Brook also testified Poulsom was evasive and placed himself in risky situations. Additionally, Brook stated that a lack of cooperation with supervision is a factor that is recognized as being related to the risk of reoffense.

■ The testimony of the two expert witnesses supports the jury's finding of changed circumstances. Indeed, "[t]he testimony of one witness, if believed, may be sufficient to prove any fact." (*People v. Rasmuson* (2006) 145 Cal.App.4th 1487, 1508 [52 Cal.Rptr.3d 598]; see Evid. Code, § 411.) Moreover, although Poulsom presented two experts who disagreed with virtually every finding and conclusion that Starr and Brook reached, "[t]he credibility of the experts and their conclusions were matters resolved against defendant by the jury," and, therefore, "[w]e are not free to reweigh or reinterpret the evidence." (*Mercer, supra*, 70 Cal.App.4th at pp. 466–467.)

Poulsom also insists the evidence does not satisfy the requirements of *Turner, supra*, 105 Cal.App.4th 1046. Poulsom's reliance on *Turner* is misplaced.

In *Turner, supra*, 105 Cal.App.4th 1046, the defendant was committed as an SVP in 1999. Before his term expired, recommitment proceedings were commenced. In 2001, after a trial, the jury found that the defendant was not an SVP, and he was released on parole. In 2002, while on parole, he was arrested for violating a curfew. A new commitment proceeding was commenced, and at the probable cause hearing, two psychologists opined that the defendant qualified as an SVP. These were the same two psychologists who

had testified in support of his commitment in 1999. They did not base their opinions and conclusions on events and evidence that occurred after the prior trial—i.e., the curfew violation—but rather on the same evidence presented at the prior trial, where the jury found that the defendant was not an SVP. Moreover, neither psychologist accepted the jury's previous and contrary finding or explained why, despite that determination, the facts were sufficiently different to support their conclusions that the defendant was likely to reoffend. (*Id.* at pp. 1050–1054, 1062–1063.)

■ The defendant claimed the expert testimony was not enough to show probable cause and argued that the district attorney was trying to relitigate the previous SVP petition. The court rejected this claim, and the defendant sought writ relief. We determined that the district attorney was barred from relitigating the issue of whether the defendant was likely to reoffend in 2001. That issue had been determined by the jury. Rather, the issue was whether the defendant was likely to reoffend in 2002. (*Turner, supra,* 105 Cal.App.4th at pp. 1059–1060.) Thus, "to establish probable cause in the subsequent proceeding, the district attorney must present evidence of a change of circumstances, i.e., that despite the fact the individual did not possess the requisite dangerousness in the earlier proceeding, the circumstances have materially changed so that he now possesses that characteristic. In requiring the district attorney to present evidence of changed circumstances, we are not suggesting that historical information is no longer relevant. It clearly is. A mental health professional cannot be expected to render opinions as to current status without fully evaluating background information. However, where an individual has been found not to be an SVP and a petition is properly filed after that finding, the professional cannot rely solely on historical information. The professional must explain what has occurred in the interim to justify the conclusion the individual currently qualifies as an SVP." (*Id.* at p. 1060.) We concluded that the expert opinion testimony, which was not based on new facts or changed circumstances, failed to support a finding of probable cause. (*Id.* at pp. 1061–1063.)

Poulsom argues the type of evidence relied on by the People's experts here is the same type of evidence we found insufficient in *Turner, supra,* 105 Cal.App.4th 1046. Poulsom misreads *Turner.* In *Turner,* we were not concerned with the type of evidence of changed circumstances. Instead, we were vexed by (1) the experts' failure to acknowledge the prior trial; (2) the experts' failure to rely on any posttrial evidence to support their opinions; and (3) the lack of any explanation regarding if or how the experts relied on the defendant's posttrial parole violation to support their opinions. (*Id.* at pp. 1062–1063.) To the contrary, here, we find no analogous problems. Unlike in *Turner* where the experts did not acknowledge the prior jury finding, here both of the People's experts specifically acknowledged our holding in *Turner* and the need to find changed circumstances after the 2007

trial. In addition, both Starr and Brook relied on post-2007 trial facts to support their opinions that circumstances had changed. Further, they explained how these new facts impacted their opinions. Therefore, our holding in *Turner* does not support Poulsom's claim that the evidence was insufficient for the jury to find a material change in circumstances.

## B. *Evidence of Volitional Impairment*

Poulsom also claims that there was insufficient evidence that he currently lacked the ability to control his behavior, or presented any current risk of sexual reoffense. We disagree.

Brook noted that Poulsom's repeat offenses evidenced his volitional impairment. Brook stated that Poulsom had been given opportunities to correct his behavior, but failed to do so. When he molested young girls, he was in sexual relationships with adult women. He has made no effort at self-improvement. He dropped out of sex offender treatment. He told one evaluator he dropped out because he did not want to confront his feelings. Poulsom also said he had no need for treatment. In addition, Brook testified that Poulsom's lack of control is demonstrated by his statement that his urges built up to the point where, if he had not molested his daughter, he would have molested someone else. In other words, he exhibited a desire to molest anyone.

Poulsom found it difficult to describe the adverse effects of his conduct on his victims. Poulsom told Brook his risk for reoffense was "zero." This answer concerned Brook because an offender, like Poulsom, should at least recognize some risk so that he can avoid situations that could trigger his offending behavior. Brook asked Poulsom what he would do to keep from committing another offense. Poulsom responded that he would stay away from areas where children congregate, like parks or playgrounds. Yet, he told another evaluator he likes to walk in the park.

Further, Brook opined that Poulsom's parole violations underscored his volitional impairment. Poulsom placed himself in risky situations where children could be present. His risk also was increased by his lack of cooperation with his parole agents. And as of 2011, Poulsom still was not participating in sex offender treatment.

Starr testified that Poulsom told her he thought about molesting his daughter before he did so. He tried to ignore the thoughts, but realized he could not. He told Starr he had neither the ability nor desire to attend sex offender treatment on his own. During the brief time he was in therapy, he expressed the fear that he would molest again. His attendance at that time

was sporadic. Starr asked Poulsom what he learned from treatment, and Poulsom could not articulate anything in particular.

Starr also testified that Poulsom's wife, Sonja, was not likely to be someone who would recognize Poulsom's risk of reoffense or offer any help to lower it. On the contrary, the marriage was a factor that increased the risk. Starr noted that with regard to the 2007 parole violation, Sonja realized they were near a park and should have called Poulsom's parole agent, but said both she and Poulsom forgot.

She did not mention the incident to the parole agent when he asked her what she and Poulsom did over the weekend. Starr found this significant in assessing Poulsom's current risk. An offender needs a support person who will help mitigate against any risk by taking the offender away from dangerous situations. Sonja did the opposite.

Sonja also made excuses for Poulsom. Additionally, Poulsom told Starr he had sex with Sonja every week or two; sex was not that important to him; and she had to remind him to have sex. It was significant to Starr that Poulsom had an available sexual partner, but he was not interested in having relations with her. Starr concluded Poulsom had intimacy deficits. Each time he molested a young girl, he was in a relationship. Instead of choosing to engage in sex with his adult partner, he opted to molest children. Like Brook, Starr also noted Poulsom's parole violations evidenced his volitional impairment because he put "himself in situations where children would be present."

Finally, none of the protective factors which decrease risk existed in Poulsom's case. He was never in the community for more than a year without a new serious offense. He was less than 70 years old. In addition, he was in good health.

Starr therefore concluded that Poulsom had a volitional impairment. He had serious difficulty controlling his behavior.

Despite the abundance of evidence supporting the jury's finding that Poulsom suffered from volitional impairment, Poulsom points us to evidence he believes highlights his volitional control. In doing so, however, Poulsom confuses our task in a substantial evidence review. The test is not the presence or absence of a substantial conflict in the evidence. Rather, it is simply whether there is substantial evidence in favor of the jury's finding. "If this 'substantial' evidence is present, no matter how slight it may appear in comparison with the contradictory evidence, the judgment must be upheld. As a general rule, therefore, we will look only at the evidence and reasonable inferences supporting the successful party, and disregard the contrary showing." (*Howard v.*

*Owens Corning* (1999) 72 Cal.App.4th 621, 631 [85 Cal.Rptr.2d 386].) Thus, we are not concerned with the contrary evidence or the inferences that Poulsom urges should have been drawn from that evidence.

■ In summary, we are satisfied substantial evidence supports the jury's finding, specifically that Poulsom's volitional impairment rendered him a danger to others because he was likely to engage in sexually violent criminal behavior.

### III

### *NUMBER OF PEREMPTORY CHALLENGES*

Poulsom next contends the trial court erred by ruling that each party was entitled to six peremptory challenges, as provided for in civil cases (Code Civ. Proc., § 231, subd. (c)), rather than the 20 challenges provided for in criminal cases potentially resulting in life imprisonment (*id.*, subd. (a)). The First Appellate District addressed this very issue in *Calhoun, supra,* 118 Cal.App.4th 519. There, the court determined a proceeding under the Act was "a special proceeding of a civil nature, and therefore pursuant to subdivision (c) of [Code of Civil Procedure] section 231, defendant was entitled to six peremptory challenges." (*Calhoun, supra,* at p. 527.)

Poulsom urges us not to follow *Calhoun, supra,* 118 Cal.App.4th 519. He argues "the constitutional requirements as enunciated by the United States Supreme Court necessarily trump the state statutes and because, interpreting the rules of civil procedure in light of other statutory provisions, it appears 10 or 20 peremptory challenges are actually authorized under the law." Poulsom, however, fails to articulate why any constitutional requirement calls into question the holding of *Calhoun.* Nor does he offer any elucidation why "other statutory provisions" authorize 10 or 20 peremptory challenges in a trial brought under the Act.

■ "[T]he peremptory challenge is not a constitutional necessity but a statutory privilege." (*People v. Wheeler* (1978) 22 Cal.3d 258, 281, fn. 28 [148 Cal.Rptr. 890, 583 P.2d 748].) " '[N]either the United States Constitution nor the Constitution of California . . . requires that Congress or the California Legislature grant peremptory challenges to the accused . . . or prescribes any particular method of securing to an accused . . . the right to exercise the peremptory challenges granted by the appropriate legislative body. [Citations.] The matter of peremptory challenges rests with the Legislature, limited only by the necessity of having an impartial jury.' [Citation.]" (*Ibid.*)

Regardless of this clear authority, Poulsom attempts to cobble a due process right to additional peremptory challenges under the Act by citing

several United States Supreme Court cases addressing the due process required for constitutionally adequate procedures. To this end, he asks us to apply certain factors set forth in *Mathews v. Eldridge* (1976) 424 U.S. 319, 333 [47 L.Ed.2d 18, 96 S.Ct. 893] to determine that he was entitled to additional peremptory challenges. We decline to do so. The United States Supreme Court has consistently held "peremptory challenges are not of federal constitutional dimension." (*United States v. Martinez-Salazar* (2000) 528 U.S. 304, 311 [145 L.Ed.2d 792, 120 S.Ct. 774]; see *Ross v. Oklahoma* (1988) 487 U.S. 81, 88 [101 L.Ed.2d 80, 108 S.Ct. 2273] ["We have long recognized that peremptory challenges are not of constitutional dimension."]; *Stilson v. United States* (1919) 250 U.S. 583, 586 [63 L.Ed. 1154, 40 S.Ct. 28] ["There is nothing in the Constitution of the United States which requires the Congress to grant peremptory challenges . . . ."].) Accordingly, we cannot create a due process right under the United States Constitution for a greater number of peremptory challenges than what the Legislature has already provided. There simply is no constitutional basis to do so.

■ Our high court has made clear that proceedings under the Act are civil in nature. (*Hubbart, supra,* 19 Cal.4th at pp. 1171–1172.) Poulsom, however, attempts to argue that the "fundamental deprivation of liberty at issue" in a proceeding under the Act requires greater protections than what is typically provided in a civil matter. To some extent, our Legislature agrees with Poulsom and already affords a defendant in a proceeding under the Act additional safeguards, many of which are found in criminal cases. For example, a defendant in a trial under the Act is entitled to the assistance of counsel. (§ 6603, subd. (a).) The court or jury must determine, beyond a reasonable doubt, the defendant is an SVP. (§ 6604.) As in criminal matters, the court must hold a probable cause hearing to determine if the matter shall proceed to trial. (§ 6602, subd. (a).) Poulsom contends because these additional protections are afforded, it logically follows that the Legislature implicitly intended to provide more peremptory challenges than what are permitted in a civil case under Code of Civil Procedure section 231, subdivision (c). We find no support for this proposition in any statute, Constitution, or case law. Indeed, the contrary appears true as courts have consistently determined that added criminal procedural protections do not change the nature of civil commitment proceedings. (See *Hubbart, supra,* 19 Cal.4th at p. 1174, fn. 33 ["[T]he use of procedural safeguards traditionally found in criminal trials [does] not mean that commitment proceedings [are] penal in nature."]; *Cooley, supra,* 29 Cal.4th at p. 252 [civil character of the Act's commitment scheme does not preclude incorporation of some criminal procedural safeguards]; see also *Kansas v. Hendricks* (1997) 521 U.S. 346, 364–365 [138 L.Ed.2d 501, 117 S.Ct. 2072] ["That Kansas chose to afford such [criminal] procedural protections does not transform a civil commitment proceeding into a criminal prosecution."].) In other words, although the

Legislature provided a defendant in a proceeding under the Act with additional protections, it stopped short of increasing the number of peremptory challenges a defendant receives. We find no authority allowing us to read such an increase into the Act.

In addition, Poulsom's request that we find a due process right to a greater number of peremptory challenges under the Act misses the mark. He should not be advocating for the court to create a new right, but instead, should lobby the Legislature. The Legislature created the procedures to determine if a defendant is an SVP. (See § 6600 et seq.) In doing so, the Legislature did not address the number of peremptory challenges a defendant must receive. Because a peremptory challenge is not a constitutional right, but a statutory benefit (*People v. Wheeler, supra*, 22 Cal.3d at p. 281, fn. 28; *United States v. Martinez, supra*, 528 U.S. at p. 311), any grant of additional peremptory challenges to a defendant in a proceeding under the Act must come from the Legislature.

There is no mention of the number of peremptory challenges offered a defendant under the Act. The only California statute dealing with the number of peremptory challenges provided to defendants is Code of Civil Procedure section 231. That section does not specifically address a proceeding under the Act. Instead, it provides a defendant with (1) 20 peremptory challenges in a criminal case if the offense charged is punishable by death or life imprisonment (Code Civ. Proc., § 231, subd. (a)); (2) 10 peremptory challenges for any other offense (*ibid.*) unless the offense charged is punishable with a maximum term of 90 days or less, where six challenges are provided (Code Civ. Proc., § 231, subd. (b)); and (3) six peremptory challenges in civil cases (*id.*, subd. (c)). As we discussed above, a proceeding under the Act is civil in nature. (*Hubbart, supra*, 19 Cal.4th at pp. 1171–1172.) Thus, a defendant should receive six peremptory challenges. (*Calhoun, supra*, 118 Cal.App.4th at p. 527.) Because there is no constitutional principle at stake, if the Act is flawed as Poulsom contends, then it falls to the Legislature or voters, not the courts, to fix it. (See *Martinez v. Board of Parole Hearings* (2010) 183 Cal.App.4th 578, 593, fn. 6 [107 Cal.Rptr.3d 439]; *In re Brent F.* (2005) 130 Cal.App.4th 1124, 1130 [30 Cal.Rptr.3d 833; *Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 334, 265 Cal.Rptr. 788].)

IV, V*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 501.

## DISPOSITION

The order is affirmed.

McConnell, P. J., and Irion, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 15, 2013, S209273.