Filed 10/29/13  P. v. Aguilar CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>JOSE MANUEL AGUILAR,<br><br>  Defendant and Appellant. | F063888<br><br>(Super. Ct. No. FP003637A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  John S. Somers, Judge.

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans, Louis M. Vasquez, Leanne Le Mon, and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A sexually violent predator (SVP) is defined as "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (Welf. & Inst. Code, § 6600, subd. (a)(1).)[1] Appellant Jose Manuel Aguilar challenges his commitment as an SVP. We hold: (1) Where, as in this case, appellant was in lawful custody at the time the SVP petition was filed, the petition was not rendered moot by a subsequent parole revocation; (2) To the extent the statements appellant made to mental health professionals during treatment fell within the dangerous patient exception to the psychotherapist-patient privilege, their admission was not error; and (3) The current version of the Sexually Violent Predator Act (SVPA; § 6600 et seq.) does not violate appellant's federal and state equal protection rights. We affirm the judgment.

## PROCEDURAL HISTORY

Appellant was born April 29, 1979. On July 12, 2002, when he was 23 years old, appellant was convicted of committing a lewd or lascivious act on a child under the age of 14, in violation of Penal Code section 288, subdivision (a). He was sentenced to eight years in prison.

On March 3, 2009, a 45-day hold was placed on appellant pursuant to section 6601.3. On April 17, 2009, prior to the hold's expiration, the Kern County District Attorney filed a petition to commit appellant under the SVPA. On May 27, 2009, a probable cause hearing was held. The trial court found probable cause to believe appellant was likely to engage in sexually violent predatory criminal behavior upon release. The matter was set for trial.

---

[1]     Further statutory references are to the Welfare and Institutions Code unless otherwise stated.

2.

On January 4, 2010, the trial court granted appellant's motion for new SVP evaluations and a new probable cause hearing pursuant to *In re Ronje* (2009) 179 Cal.App.4th 509 (*Ronje*).[2]  On August 27, 2010, a new hearing was held, probable cause was again found, and the matter was again set for trial.

On May 13, 2011, appellant's parole was revoked.  He was given a four-month term.

On October 26, 2011, following a court trial, appellant was found to be an SVP. That same day, he was committed to Coalinga State Hospital/Department of Mental Health (DMH) for an indeterminate term.[3]

**FACTS**

**I**

**PROSECUTION EVIDENCE**

The testimony of Dr. Michael Selby.

Dr. Michael Selby, a board-certified forensic psychologist and professor of psychology at California State University, San Luis Obispo, had performed mentally disordered offender (MDO) and SVP evaluations for a number of years.  He had also performed evaluations for the San Luis Obispo courts with respect to competency and sanity (NGI).

---

[2]     Recently, in *Reilly v. Superior Court* (2013) 57 Cal.4th 641, the California Supreme Court held that, when evaluations initially supporting the filing of a commitment petition are conducted under an assessment protocol later determined to be an invalid regulation, the petition did not necessarily need to be dismissed.  Unless the SVP shows the invalid assessment protocol materially affected his or her initial evaluation, "'the question of whether a person is a sexually violent predator should be left to the trier of fact.'" (*Id*. at p. 656.)  The high court disapproved *Ronje* to the extent it was inconsistent with their holding.  (*Reilly v. Superior Court*, at pp. 646, 652-653.)

[3]     The Department of Mental Health is now known as the Department of State Hospitals.  To maintain consistency with the contents of the record on appeal, we will continue to refer to it as DMH.

Selby met with appellant on three occasions. The first interview took place at the California Men's Colony on March 10, 2009, and lasted approximately 90 minutes. The second and third interviews took place at Coalinga State Hospital on January 11, 2010, and February 11, 2011. Each of those interviews lasted approximately 45 minutes.

Prior to meeting with appellant the first time, Selby reviewed documentation from the prison, from DMH, and from appellant's medical records. From these documents, Selby concluded appellant had been convicted of a qualifying offense under the SVPA.

Selby then examined the issue of whether appellant had a diagnosable mental disorder. Selby considered appellant's juvenile and adult criminal history. In 1995, when appellant was 16, he molested V., a nine-year-old boy for whom appellant's mother babysat. Appellant sodomized V. and forced V. to orally copulate him approximately eight times over about a five-month period.[4] According to V., appellant threatened to cause him greater injury by sodomizing him more forcibly if V. told anyone. As a result, appellant was found to have violated Penal Code section 288, subdivision (a). Appellant spent 120 days in juvenile hall and then was sent to a group home for sex offenders, the Shiloh Group Home (Shiloh).

Selby reviewed the Shiloh discharge summary, dated November 18, 1996. It related that appellant admitted, in therapy, to having participated in at least 140 different sexual offenses against 30 children in the past; to having "urges" that overrode his ability to control his thinking, emotions, and behavior; and to masturbating two or three times a day to fantasies of molesting children. It further related Shiloh's bus route had to be changed because appellant was discovered looking at the elementary school children as the bus passed and reporting that he wanted to molest some of them. Appellant became angry when the route was changed. Appellant also reported wanting to molest several of the group home's residents. As a result of the statements appellant made at Shiloh,

---

[4]     Appellant may have been 15 when he first assaulted V.

4.

investigators interviewed V.'s four-year-old brother, K., who reported appellant had sodomized him and forced him to orally copulate appellant. A second victim, P., was also found. She was appellant's next door neighbor, and related that they had sex between 10 and 20 times when she was 12 to 13 years old and appellant was 15. Charges were brought against appellant and he was subsequently found to have committed two counts of violating Penal Code section 288, subdivision (a). Appellant was sent to the California Youth Authority (CYA).[5] He was released from CYA when he was 21.

Following his parole from CYA, appellant went to live with his father, father's girlfriend, and the girlfriend's daughter, S. Approximately two years later, in 2002, S. reported appellant engaged in sexual relations with her against her will for approximately two years, when she was 12 and 13 years old. The sexual conduct consisted of penile penetration and oral copulation.

During the March 10, 2009, interview, appellant told Selby that he had eight victims, and he gave the first names and ages of four of them. Appellant said Ro. was 10 years old, and he fondled her about 10 times; Re. was four or five years old, and he had oral sex with her twice; Ra. was five years old, and he had oral sex with her several times; and E. was eight years old. Appellant did not say what kinds of sexual acts occurred with her. With respect to the documented offenses, appellant said that when the police accused him of orally copulating and sodomizing V., he admitted doing so. He also said he had sex with P. twice.

Based on this history, Selby diagnosed appellant with a mental disorder, that of "pedophilia, both sexes, nonexclusive type." That disorder, described in the Diagnostic and Statistical Manual of Mental Disorders (DSM), has the criteria of recurrent sexually

---

[5] CYA is now known variously as the Division of Juvenile Facilities and the Division of Juvenile Justice. To maintain consistency with the contents of the record on appeal, we will continue to refer to it as CYA.

arousing fantasies, urges, or behavior associated with prepubescent children (normally 13 years of age or younger), by a person at least 16 years of age, and with a five-year age differential between perpetrator and victim.

Selby acknowledged he had no information that appellant had acted out sexually in the more recent years during which he was in custody. Nevertheless, Selby opined appellant currently continued to have the mental disorder of pedophilia, because "mental illness doesn't go away[; t]here is no cure for any form of mental illness." He explained that mental illness is treated with medication, and/or psychotherapy. If adequate treatment is not provided, the person cannot control his or her symptoms. In the case of pedophilia, there is no medication; only treatment. Selby explained that the treatment program at Coalinga State Hospital attempts to provide the individual with skills that will enable him or her to deal with high-risk situations and not molest again. Insofar as Selby was aware, appellant never participated in the SVP program offered at Coalinga State Hospital. Although appellant participated in anger management, substance abuse treatment, and at least one other program, none of his programs directly addressed sex offenses or their sexual pathology. In Selby's opinion, this was not sufficient treatment. Without the appropriate treatment, Selby opined, "it must be assumed that [the] mental illness is not in remission."

In addition to the diagnosis of pedophilia, Selby gave appellant the diagnosis of antisocial personality disorder because of the "clear evidence in childhood of significan[t] behavioral problems," problems with the law in adulthood, and lack of empathy for his victims. Selby explained that antisocial personality disorder lowers the ability to control one's pedophilia.

Next, Selby evaluated whether appellant was likely to reoffend in a sexually violent predatory manner. He considered the likelihood appellant's symptoms could be treated in a less structured setting than Coalinga State Hospital. Selby looked at appellant's level of participation in treatment. He explained that if an individual chose

not to participate in treatment in the hospital, it was unlikely he or she would participate in treatment once released into the community. Selby opined that appellant was likely to reoffend because he was not participating in treatment and so his mental illness was not in remission. Appellant told Selby that he did not believe he had any type of sexual pathology. Selby found it unlikely appellant would participate if appellant did not believe he had any sexual problems. In their last interview together, appellant did say he planned to participate in a sex offender treatment program, but he did not know the name of the program. Selby found there was a strong likelihood appellant would not follow up with treatment on his own. Selby found appellant to meet "the legal standard of [a] serious well-founded risk for committing another sexually violent predatory crime."

The testimony of Dr. Eric Simon.

Dr. Eric Simon testified to being a board-certified clinical and forensic psychologist. He had, during his practice, conducted approximately 1,600 MDO evaluations and about 500 SVP evaluations. Of the 500 SVP evaluations, he found approximately 50 individuals to meet the criteria of SVP.

Simon met with appellant on three occasions. The first interview, which took place at the California Men's Colony on December 18, 2008, lasted approximately 90 minutes. The second, which took place at Coalinga State Hospital on February 13, 2010, lasted approximately 30 minutes. The third, which took place at Coalinga State Hospital on February 14, 2011, lasted approximately 15 minutes. Simon also reviewed appellant's prison central file and his medical file.

Simon found appellant's 2002 conviction for committing a lewd or lascivious act on a child under 14, which arose from his conduct with S., to be a qualifying sex offense.

Simon diagnosed appellant with pedophilia, attracted to both males and females, nonexclusive (meaning appellant also had a sexual interest in adults). Although generally, the diagnosis applies to individuals who are 16 years of age or older, an individual can come within the diagnosis if he or she is considered a "precocious

7.

pedophile." Such an individual engages in pedophilic behavior with children who are significantly younger — for example, "a 14 or 15 year old [] who [] sexually molest[s] a three or five or six year old child." Simon found it significant appellant had demonstrated a "pervasive pattern of deviant sexual arousal and interest, fantasies, and behavior with prepubescent children." Appellant's qualifying offense occurred only a short time after appellant paroled from CYA. Appellant was 20 years old at the time, and the victim was 12. Simon found this to demonstrate "a certain degree of compulsivity." Simon noted that appellant's molestation of S. occurred during a time when appellant reported that he had numerous available adult sexual partners: a girlfriend with whom he cohabited, as well as "about 30 adult sexual partners" whom he met through a club at which he worked. Simon found significant that, when appellant had available adult female sexual partners, he turned to children.

Simon described appellant's conduct with V. and K. as constituting "two more data points of prepubescent children that he had sexual activity with." He explained that, as a result of this conduct, appellant was placed at Shiloh on February 18, 1996, when he was not quite 17.

Simon found it significant that, according to Shiloh's discharge summary, appellant admitted, during counseling, to having sexually molested over 30 children, with the molestations involving approximately 140 sexual acts. Shiloh staff indicated appellant expressed very little remorse or empathy for his victims; appellant admitted viewing children as objects and that his sexual urges controlled his thinking, actions, and emotions. Appellant also apparently stated at the time that he had fantasies about raping his mother and would do so if given the opportunity. Simon noted the 1997 Kern County juvenile probation officer's report indicating that, when appellant was driven on a daily bus ride, staff discovered he was "fixating" when passing by an elementary school. Simon understood that appellant was leering out the window, staring at the little children. Due to appellant's behavior, the bus route was changed. Appellant expressed a lot of

anger about the route being changed. He then later admitted he enjoyed driving by and looking at the young children; it reminded him of his molesting of his victims and he wanted to molest some of the school children. In therapy, appellant admitted masturbating two to three times per day while fantasizing about his previous molestation victims and other young children, and he repeatedly stated that if given the opportunity, he would reoffend. Simon found such behavior to meet the diagnostic criteria of pedophilia.

Simon noted also that appellant, during the time he was in Shiloh, repeatedly made sexual comments about other placement wards and verbalized his desire to engage in sex acts with them. Appellant was ultimately terminated from Shiloh and sent to CYA. During the termination process, an investigation revealed appellant had had numerous acts of sexual intercourse with a 12-year-old neighbor when appellant was approximately 15. That behavior led to a criminal finding.

Appellant explained to Simon that he did not have 30 sex-offense victims, but rather, staff instructed him to make a list of anybody with whom he had ever had sex. When Simon asked appellant his number of victims, appellant responded "nine," and gave Simon a list of children he said he molested. This list included V., a nine-year-old boy. Appellant reported that he forced oral copulation and sodomy on V. for "[a]bout a year" when appellant was 16. Also on the list was K., V.'s little brother. Although appellant told Simon that he did not actually molest K.; K. walked in and saw appellant molesting V. Appellant listed his sister, Re. Appellant said he orally copulated her when she was four or five and he was 15 or 16. Appellant listed P. Appellant first said he was 15 and she was 12, and it happened for about a year. Appellant then said he was 13 to 15. Appellant's behavior against P. resulted in a criminal finding. Appellant listed his six-year-old cousin, B. Appellant orally copulated her. Appellant was 14 years old and this went on for about a year. Appellant listed a step-aunt, Ra., who was three or four years old. He was 14 years old. He orally copulated her five or six times over a six-

9.

month period. Appellant said he tried to sodomize his six-year-old brother, C., when he, appellant, was 14 years old. Appellant further reported that he also had a sister named Ro. When he was 13 and she was 11, he grabbed and fondled her "about 10 times." Appellant then said this happened during the years he was 13 to 15 years old. Appellant talked about E., the daughter of his mother's friend. Appellant was 13 to 14 years old; E. was five or six. One day when her mother was over at his mother's house and the mothers were in another room, he touched E.'s genitals. Appellant talked about J., his 12-year-old cousin; he said he orally copulated her for about three years until he was 15 or 16. As for S., the victim of the qualifying sex offense, appellant said she was 13 or 14 years old (although the probation officer's report reflected S. was 12) when the sex acts began. Appellant said S. kind of looked up to him and developed a crush on him, and he had sexual intercourse with her on two occasions and made her orally copulate him a few times over the course of 10 months.

Simon found appellant "demonstrated a rather persuasive pattern of sexual activity with young children beginning from around the time he was 12 or 13." In Simon's opinion, the diagnosis of pedophilia currently applied to appellant. He testified that the "consensus in the field" was that mental illnesses, such as personality disorders and paraph[i]lias, tend to be chronic, lifelong conditions that do not "extinguish themselves over time without some major intervention." Thus, although it had been several years since appellant molested anyone, Simon concluded appellant was still a pedophile. Because there were no children in the correctional setting or locked hospital, it would be "very atypical" to see current signs of the disorder, although one might see possession of child pornography. Simon had found two prior SVP individuals (out of approximately 50) to have child pornography in their files. The possession of child pornography was not noted anywhere in appellant's file. In their interviews, appellant told Simon that he did not tend to use pornography much and had never viewed child pornography.

In Simon's opinion, appellant had done nothing substantial to address his chronic disorder of pedophilia. He was housed at Coalinga State Hospital, which had a treatment program involving a number of phases of intensive treatment focused specifically on the disorder, but appellant had consistently declined to participate in favor of participating in what were referred to as "peripheral" groups that address other issues.

Simon next looked at whether, as a result of appellant's current diagnosed mental disorder, appellant would be likely to reoffend in a sexually violent criminal predatory manner. Simon looked at "the totality of all of the facts," and also obtained "a baseline." Simon used three different actuarial instruments, the Static-99R, the Static 2002 R, and the Minnesota Sex Offender Screening Tool Revised MnSOST-R), to determine, generally, whether individuals with histories similar to appellant's tended to reoffend. Such instruments can give a group risk, but cannot predict whether appellant himself will reoffend.

The Static-99R is commonly used for assessing risk offense with sex offenders. It has been shown to be of moderate predictive accuracy. Out of the 10 factors, appellant scored an eight. Individuals with a similar score tend to sexually reoffend within five years of postrelease at the rate of approximately 24 to 45 percent, and within 10 years of postrelease at the rate of 40 to 55 percent. With respect to sex offenders in general, 97 to 98 percent have scores lower than eight on this instrument. Since the average sex offender has a static score of two, appellant's risk of reoffense was approximately five times higher than the average sex offender.

The Static 2002 R is similar to and incorporates some of the same factors as the Static-99R, and has similarly been found to be a moderate predictor of sex offense recidivism. The Static 2002 R has 14 factors; appellant scored a 10. Simon explained this to be a very high score; approximately 99 percent of sex offenders score below 10. Individuals with a score of 10 recidivate at a rate of 43 to 48 percent within five years, and at a rate of approximately 54 to 58 percent within 10 years, postrelease.

11.

On the MnSOST-R, appellant originally scored 15; his score dropped to 13 by the time of his trial because he was older. A score of 13 is considered to be in the very high range. This instrument uses six-year periods for recidivism estimates: people with a score of 13 have recidivism rates in the range of 40 to 72 percent within six years postrelease.

Simon considered appellant's personal history of sex offending. Appellant was not "an incest only offender," but rather had a history of committing "predatory sex offenses." Simon opined that, not only would appellant be likely to commit a new sexually violent offense, but the future offense "could well be predatory." Simon was asked about appellant's age at trial: age 32. Simon explained that, at age 32, appellant had "a lot of years left to potentially reoffend." Simon also explained that, at age 32, appellant had not yet "suffered the hormonal changes" men tend to "go through as they reach the fifth and sixth and seventh decades of life," nor had he received the "benefit of the emotional maturation." When asked what type of crime Simon would expect appellant to commit if he reoffended, Simon responded that it would be "a pedophilic sex offense," meaning, molestation of a child under the age of 12 or 13.

Simon considered appellant's failure to participate in the phase treatment program at Coalinga State Hospital (a program which included a relapse prevention plan). In his meetings with appellant, appellant never discussed a relapse prevention plan. Appellant said he was hoping to live in a halfway house group home in Bakersfield with other male sex offenders, but he did not know the name of the program. He had recently received a flyer on it and was attempting to obtain more information. Simon did not consider appellant to have sufficient volitional power to pursue community treatment. Simon also did not believe appellant would be able to refrain from reoffending unless he was in a locked facility without access to children.

## II

### DEFENSE EVIDENCE

The testimony of Dr. Marianne Davis.

Dr. Marianne Davis, a clinical psychologist, conducted approximately 250 SVP evaluations over a number of years. In December 2008, DMH asked her to evaluate appellant. To do so, she reviewed his central file, together with his medical and mental health files, and interviewed him at the California Men's Colony.

The documents Davis reviewed contained information on child victims V., K., P., and S. Given the girls' ages, they could have been pubescent at the time of appellant's sexual contact with them. Davis also took into account information contained in the Shiloh discharge summary. Davis found appellant to be "quite forthcoming" in her interview with him; he acknowledged his offending, did not try to minimize what he had done, and acknowledged having offended against some children about whom Davis knew nothing, something she thought was "pretty important."

Davis concluded appellant had committed a qualifying offense. She then considered a diagnosis of pedophilia. She examined when the offenses took place, the victims, and appellant's "adult trajectory." She found it significant that all appellant's offenses occurred when he was an adolescent and that he had no history of offending against prepubescent children after he turned 16, was arrested and "went into the group home." Davis found nothing in the records to indicate that appellant had a sustained enduring interest in sexual activity with children that continued into adulthood.

Davis explained that the DSM requires an individual to be at least 16 years of age for a diagnosis of pedophilia. With respect to S., Davis opined, based on her knowledge, training, and experience, that S. likely was pubescent at the time. S. would have been

13.

almost 13 when the sexual conduct with appellant began, and she herself said she was sexually active with her boyfriend.[6]

In Davis's opinion, appellant engaged in "adolescent limited offending against children." She had no data to indicate that appellant had a history as an adult of "continued interest of sexual activity with children." Davis did not believe appellant met the criteria for a diagnosis of pedophilia, even though she took into consideration that he continued to offend against V. for 10 weeks after turning 16. Because of his offense against S., she gave him a diagnosis of adult antisocial behavior in her 2008 report, but did not believe he had exhibited any significant antisocial behaviors in the prior 10 years. This was not the same thing as antisocial personality disorder, which she did not believe he had, and it did not change her opinion that he did not fit the SVP criteria.

Davis did a risk assessment with appellant. She did so even though she considered it superfluous due to appellant not having the requisite mental disorder for an SVP finding. Appellant first scored a five on the Static-99. With the revised instrument, because of his age, he scored a six. On the MnSOST-R, appellant scored a seven. Davis concluded his risk of reoffending was in the moderate range.

Davis explained that not all child molesters are pedophiles. A person may engage in illegal sexual activity with a prepubescent child out of choice, as opposed to that activity being a product of a mental disorder that impairs the individual's ability to control his or her behavior. Because she did not believe appellant had the mental disorder, he would not have persistent, strong urges to engage in sexual activity with children. Appellant's offenses occurred when he was an adolescent, and research shows that the vast majority of adolescents who offend against children do not do so as adults.

---

**6**     Davis was inferring S. was pubescent because she was having sex with someone else. If S. were prepubescent, this would change Davis's diagnosis.

Appellant talked to Davis about his victims, including those for which his offenses did not result in convictions. Davis found the number of victims "very disturbing," but did not see such offenses sustained through adulthood.

The testimony of appellant.

Appellant testified and denied he ever told anyone he had 30 victims.[7] He said that number came from his interviews with the psychologist at Shiloh. Appellant told the psychologist he had eight victims; the larger number came from questions about the number of people with whom appellant had had sexual contact. Other than the eight, appellant's sexual partners were his age or older. Appellant denied having sexual contact with 30 minors. He testified he did not have sexual contact with any minors whom he had not known for a significant period of time.

When appellant was paroled from CYA, he went to live with his uncle. Around July or August 2000, he moved from his uncle's residence to live with Anna P. He lived with her until his arrest on May 16, 2002. Anna P. had a seven-year-old daughter and a 13-year-old son. Appellant did not engage in any sexual acts with either of them, despite being home alone with them at various times. Appellant did not engage in any such activity with them because he did not have a mental illness and he felt no sexual attraction to them.

From the time of his release from CYA to his arrest in 2002, appellant was not attracted to any children under the age of 12. With respect to S., appellant was around her when he started visiting his father during the time he lived with his uncle. They started having talks about appellant and his girlfriends, and S. would mention her boyfriends and what she did with them. S. said she was already having sex with one boyfriend, and she had a boyfriend close to appellant's age. She and appellant started having a sexual relationship. Although appellant was living with Anna P. and having 15

---

[7]     He also denied ever having rape fantasies.

to 20 one-night stands during the time period, he also had a relationship with S., a 12- or 13-year-old girl, because, he said, he was very immature and selfish at the time. Appellant explained that he was only 21 then. He was 32, had been in prison and the hospital, and had become more responsible and able to see the full consequences of what he did, both in terms of himself and in terms of the lives he destroyed. He did not think what he did when he was 15 or 16 was a sickness; he acted out sexually because of the things he was going through with family.

Appellant was asked about the school bus incident referred to in the Shiloh report. He said the vehicle was a van that was used to take the group home residents to their various schools. Appellant admitted that he was accused of looking at the children as the van passed an elementary school, but he denied doing so. He stated the route was changed. He testified that he was very upset about it because it was not true. Appellant denied having fantasies concerning young children. As for the other residents about whom there was concern, appellant stated they were 14 or 15 years old. Shiloh did not have residents under the age of 12.

Appellant admitted sexually victimizing 11 children. He remembered his first victim was V., and that V. told him no, but he "continued with it anyway." He did not recall who his last minor victim was.

In looking back on his life and his interaction with the various minors, appellant felt disgusted by what he had done. He had considered his plans if he were released. He considered counseling at Panama Ranch, which is a sex offender halfway house for men. His attorney had contacted that program on his behalf. Appellant was willing to engage in counseling even though he did not feel he had a mental illness, because he felt there were "still core issues that [he] need[ed] to deal with not pertaining to a mental disorder." He knew it was not normal for a 13- to 15-year-old "to engage in sexual activity with minors" and to do so with "family members."

16.

Appellant had been at the hospital for two years at the time of trial. He had "Team" every few months and, every time, it was recommended that he participate in the "phase program." Appellant acknowledged that every time he had been asked to participate, he had chosen not to. He did that because he did not believe he had a mental disorder, he did not want to sign a contract admitting he had a mental disorder, and he would have to lie and say the Shiloh "discharge papers" and the "probation reports" were true. He believed those documents contained "a lot of inaccuracies."

Appellant did not consider it likely that, if released, he would engage in sexual acts with prepubescent children because, he said, he had "no attraction towards them." Also, he did not want to return to prison for a sex offense because such inmates were in danger of physical harm from other inmates. His conviction was not known to the other inmates when he was serving his sentence, but he was afraid the information would become known and he would be harmed.

The testimony of Anna P.

Anna P. testified that she and appellant had lived together for two to three years, and they had a daughter together. Anna P.'s daughter was eight or nine when appellant first moved in, and her son was around 13. It was common for Anna P. to go to work while appellant remained home with the children. During the time she and appellant lived together, there was never any indication to suggest appellant was acting inappropriately with either of Anna P.'s children. Anna P.'s daughter, who was 19 at the time of trial, confirmed that appellant never did anything sexual or inappropriate toward her.

**DISCUSSION**

**I**

**REVOCATION OF APPELLANT'S PAROLE**

As set out in the procedural history, *ante*, appellant's parole was revoked for four months after the SVP petition was filed and the post-*Ronje* probable cause hearing was

17.

held, but before trial.[8]  Appellant now claims the revocation of his parole mooted the SVP petition, causing the trial court to lack authority to commit appellant as an SVP because no timely petition was filed.  He is incorrect.

"The overall purposes of the SVPA are to protect the public from a select group of extremely dangerous offenders and to provide treatment for those people.  [Citation.]" (*People v. Carroll* (2007) 158 Cal.App.4th 503, 510.)  The statutory scheme is designed to balance the need for public safety against the rights of the offender.  (*In re Lucas* (2012) 53 Cal.4th 839, 845.)  As summarized in *People v. Poulsom* (2013) 213 Cal.App.4th 501, 516-517,

> "The process for determining whether a convicted sex offender meets the requirements for classification as an SVP … 'takes place in several stages, both administrative and judicial.'  [Citation.]  Generally, the Department of Corrections and Rehabilitation and the Board of Parole Hearings screen inmates in the custody of the department who are 'serving a determinate prison sentence or whose parole has been revoked' at least six months before their scheduled date of release from prison.  (§ 6601, subds. (a)(1), (b).)  'This process involves review of the inmate's background and criminal record, and employs a "structured screening instrument" developed in conjunction with the [DMH].  [Citation.]  If officials find the inmate is likely to be an SVP, he is referred to the [DMH] for a "full evaluation" as to whether he meets the criteria in section 6600.' [Citation.]
>
> "When the full evaluation reveals the inmate has suffered the required qualifying prior convictions of a sexually violent offense against one or more victims (§ 6600, subds. (a)(1) & (2), (b)) and two licensed psychologists and/or psychiatrists agree the inmate 'has a diagnosed mental disorder so that he or she is likely to engage in acts of sexual violence without appropriate treatment and custody' (§ 6601, subd. (d)), the DMH 'shall' forward a request for a petition for commitment under the [SVPA], with copies of the evaluation reports and other supporting documents, to the county in which the alleged SVP was last convicted.  (§ 6601, subds. (d),

---

[8]  The record on appeal — which, on this issue, consists of appellant's prison chronological history — does not explain how appellant came to be on parole in light of the pending SVP petition, or why his parole was revoked.

(h).)  If the county's designated attorney concurs in the request, a petition for commitment is filed in that county's superior court.  (§ 6601, subd. (i).)

"Once the commitment petition is filed, the court holds a probable cause hearing to 'determine whether there is probable cause to believe that the individual named in the petition is likely to engage in sexually violent predatory criminal behavior upon his or her release.'  (§ 6602, subd. (a).)  If such probable cause is found, the judge 'shall' order that a trial be conducted 'to determine whether the person is, by reason of a diagnosed mental disorder, a danger to the health and safety of others in that the person is likely to engage in acts of sexual violence upon his or her release.'  (*Ibid*.)  The trier of fact must unanimously determine beyond a reasonable doubt whether the person named in the petition is in fact an SVP.  (§§ 6603, subd. (f), 6604.)  Either party may request a trial by jury.  (§ 6603, subds. (a), (b).)

"If the person is determined to be an SVP, he or she shall be committed to the custody of the DMH for an indeterminate term 'for appropriate treatment and confinement in a secure facility' (§ 6604), subject to annual review to consider whether the person currently meets the definition of an SVP and whether conditional or unconditional release is in the person's best interest and conditions could be imposed that adequately protect the community (§ 6605, subd. (a))."

An SVP petition can only be filed "if the individual was in custody pursuant to his or her determinate prison term, parole revocation term, or a hold placed pursuant to Section 6601.3, at the time the petition [was] filed."  (§ 6601, subd. (a)(2).)  Subdivision (a) of section 6601.3 allows the Board of Parole Hearings, upon a showing of good cause, to order a person referred to DMH to remain in custody for up to 45 days beyond the person's scheduled release date for full evaluation.

Appellant does not dispute that he was in lawful custody at the time the SVP petition was filed.  His argument is that, once his parole was revoked, the entire process — including initial screening, referral, and evaluation — had to start over.  Failure to do so, he argues, rendered the petition invalid.

We are not cited to any authority directly on point, and our own research has disclosed none.  In *Brown v. Superior Court* (2013) 213 Cal.App.4th 61, 69, which was

filed after briefing was completed in the present case, the appellate court remarked: "Once Brown was returned to custody for his parole revocation sentence, the SVPA screening procedures under section 6601, subdivisions (a) and (c) were again triggered." The issue in that case, however, was not whether Brown's parole revocation *required* that the SVP procedures start anew, but whether, at the time the second (and relevant) SVP petition was filed, Brown was lawfully in custody pursuant to a 45-day hold under section 6601.3. (*Brown v. Superior Court*, at pp. 65, 70.) Cases are not, of course, authority for propositions not considered. (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1176.)

Appellant relies on *Turner v. Superior Court* (2003) 105 Cal.App.4th 1046 (*Turner*) for the notion that a new SVP proceeding must be initiated following a parole revocation. Turner was originally adjudged an SVP and committed to a state hospital for treatment for the then-statutorily mandated two-year term. (*Id.* at p. 1051.) Toward the end of that term, the district attorney filed a new petition seeking to recommit Turner for another two years. At the conclusion of the trial on the recommitment petition, the jury found in Turner's favor, and so he was released from custody the next day and placed on parole. (*Id.* at pp. 1051-1052.) Turner subsequently violated the terms of his parole, his parole was revoked, and he was returned to custody for six months. During that six-month period, the district attorney filed a petition seeking to again commit Turner under the SVPA. (*Turner,* at p. 1052.) Turner moved to dismiss the petition on the ground the prior jury finding that he was not an SVP was binding, particularly because the supporting psychological reports contained no new information other than the curfew violation that resulted in the revocation of Turner's parole. The trial court rejected Turner's arguments, found sufficient evidence of probable cause despite the earlier jury finding, and set the matter for trial. (*Id.* at pp. 1052-1053.)

Turner petitioned for a writ of mandate in the Court of Appeal. (*Turner*, *supra*, 105 Cal.App.4th at p. 1053.) The appellate court held a petition could be filed when a

20.

person had been returned to custody on a parole revocation, without that person having been convicted and sentenced on a new crime. (*Id*. at p. 1056.) The court concluded, however, that collateral estoppel principles barred the district attorney from relitigating the specific finding reached by the jury in the prior SVP proceeding (*id*. at pp. 1058-1059); hence, to establish probable cause in the subsequent proceeding, the district attorney was required to present evidence of a change of circumstances (*id*. at p. 1060).

Appellant contends *Turner* holds that parole revocation restarts the SVP process. This overstates the matter. We are also unconvinced by appellant's claimed reliance "on the need for fairness and reciprocity," and his assertion "the procedures involved in the SVP process are subject to a notion of reciprocal fairness .…"

As support for this proposition, appellant points to *Bagration v. Superior Court* (2003) 110 Cal.App.4th 1677, in which the appellate court held that, despite the fact the SVPA is civil rather than criminal (*Bagration v. Superior Court*, at p. 1683), an alleged SVP could not avail him- or herself of the summary judgment procedures contained in Code of Civil Procedure section 437c. The Court of Appeal found that statute to be "inherently inconsistent with the [SVPA] because the *mutual* summary procedures set forth in Code of Civil Procedure section 437c, if applied to [SVPA] proceedings, would allow an individual to be adjudicated a sexually violent predator without benefit of the required beyond a reasonable doubt burden of proof and, in the case of a jury trial, a unanimous verdict-impairing the requirements that are at the heart of the statute's due process protections." (*Bagration v. Superior Court*, *supra*, at pp. 1688-1689.) The appellate court did not directly address Bagration's claim that mutuality is not required in SVPA probable cause hearings, but rather determined its mission was to discern legislative intent. (*Bagration v. Superior Court*, at p. 1689.) Because the statutory summary judgment procedures could not be incorporated into SVPA proceedings without a material alteration, it concluded, the Legislature could not have intended their inclusion. (*Bagration v. Superior Court*, at p. 1689; see also *Murillo v. Superior Court* (2006) 143

21.

Cal.App.4th 730, 740 [district attorney cannot propound requests for admissions in SVP proceedings, because requiring alleged SVP to respond thereto would violate due process rights of proof beyond a reasonable doubt, a jury, and a unanimous verdict].)

We do not believe the foregoing cases stand for the proposition that, under the circumstances here, the purposes of the SVPA would be served by invalidating the petition.

The purpose of the initial screening and evaluation "is not to identify SVP's but, rather, to screen out those who are not SVP's. 'The Legislature has imposed procedural safeguards to prevent meritless petitions from reaching trial. "[T]he requirement for evaluations is not one affecting disposition of the merits; rather, it is a collateral procedural condition plainly designed to ensure that SVP proceedings are initiated only when there is a substantial factual basis for doing so."' [Citation.] The legal determination that a particular person is an SVP is made during the subsequent judicial proceedings, rather than during the screening process. [Citation.]" (*People v. Medina* (2009) 171 Cal.App.4th 805, 814; accord, *Davenport v. Superior Court* (2012) 202 Cal.App.4th 665, 669, disapproved on another ground in *Reilly v. Superior Court*, *supra*, 57 Cal.4th at p. 655 & fn. 2.)

As appellant concedes, up to the time of his arrest and parole revocation, "everything was fine in the sense that the district attorney was authorized to seek appellant's commitment [as an SVP]." In light of the purpose of the SVPA's screening and evaluation procedures, "once the [SVPA] has been satisfied by sufficient expert opinion that the subject person meets the [SVPA's] criteria [and probable cause has been found to believe the individual is likely to engage in sexually violent predatory criminal behavior upon his or her release], little in the way of justice would be gained by permitting proceedings to be derailed by the possibly fortuitous timing" of a parole revocation. (*Gray v. Superior Court* (2002) 95 Cal.App.4th 322, 329.)

22.

Several cases support our conclusion, albeit indirectly. In *People v. Wakefield* (2000) 81 Cal.App.4th 893, Wakefield was adjudged an SVP under petitions filed in March 1997 and October 1997.[9] In part, he contended a commitment based on the October 1997 petition was invalid because the psychological evaluations, having been performed in February 1997, prior to the March 1997 petition, were not current. He also complained he was not screened or evaluated prior to the filing of the October 1997 petition. (*Id*. at p. 899.) The Court of Appeal rejected Wakefield's claim, observing (1) Wakefield did not raise the issue in the trial court; (2) the psychologists who evaluated Wakefield testified at the probable cause hearing that their diagnoses were current and unchanged from their earlier evaluations; and (3) even if a new screening and evaluations should have been conducted prior to the October 1997 petition, no reversal would be warranted because the evaluations were sufficient for the March 1997 petition, and the commitment was based on both petitions. (*Id*. at p. 900.)

In the present case, appellant did not raise the lack of postrevocation screening and evaluations in the trial court. Moreover, the screening and evaluations that were performed were clearly sufficient for the petition that had not yet been decided on the merits, and appellant was free at trial to question the experts on whether their diagnoses were current.[10]

In *Davenport v. Superior Court*, *supra*, 202 Cal.App.4th 665, the initial evaluations concluded Davenport met the criteria for SVP commitment, the district

---

**9** The only difference in the petitions was Wakefield's place of incarceration. (*People v. Wakefield, supra,* 81 Cal.App.4th at p. 896.)

**10** Appellant notes that he was in his 20's at the time of his evaluations, whereas he would have been in his 30's had new evaluations been performed, and the likelihood of reoffending declines with age. First, appellant, having been born in 1979, was 29 years old when he was first evaluated by Selby, Simon, and Davis. Second, any effect changes in appellant's age might have had on the likelihood he would reoffend was brought out at trial.

attorney filed a commitment petition, and the trial court found probable cause to believe Davenport was an SVP. After the probable cause hearing, but prior to trial, *Ronje* invalidated the standardized assessment protocol. As a result, the trial court ordered two new evaluations of Davenport using the new assessment protocol. This time, the evaluators disagreed whether Davenport met the SVP criteria. The trial court appointed two new evaluators; the result was another split of opinion. Davenport then moved to dismiss the petition on the ground it was not supported by two valid concurring mental health evaluations. The trial court denied the motion and set the matter for a new probable cause hearing. Davenport then petitioned the Court of Appeal for a writ of mandate. (*Davenport v. Superior Court*, at pp. 667-668.)

The Court of Appeal refused to order dismissal of the petition. It observed: "The initial evaluations in *Ronje* and in the instant case had served their purpose by the time the Director of the DMH forwarded the request to file a commitment petition.… After the petition has been filed, the People's burden is not to prove two evaluations exist, but to prove the alleged SVP is a person likely to engage in sexually violent predatory criminal behavior. [Citation.] That burden may be carried by presenting the testimony of one or more experts at trial on behalf of the People. [Citation.]" (*Davenport v. Superior Court, supra,* 202 Cal.App.4th at p. 671.) The court quoted with approval the statement in *Gray v. Superior Court, supra,* 95 Cal.App.4th at page 329, that "'once a petition has been properly filed and the court has obtained jurisdiction, the question of whether a person is a sexually violent predator should be left to the trier of fact unless the prosecuting attorney is satisfied that proceedings should be abandoned.' [Citation.]" (*Davenport v. Superior Court*, at p. 672.) The court concluded: "Given the substantial risk of serious harm that could result from releasing a potential SVP to the public, dismissal is a drastic step. SVP evaluations may change over time for reasons other than that an individual no longer qualifies as an SVP.… Given the procedural safeguards in place — a probable cause hearing, a jury trial, a unanimous verdict — there is no need to

24.

dismiss the commitment petition and start the SVP evaluation process from the beginning in this case." (*Id*. at p. 673.)

In *People v. Poulsom*, *supra*, 213 Cal.App.4th 501, Poulsom waited until after a trial at which the jury found him to be an SVP, to challenge the earlier probable cause determination. (*Id*. at p. 520.) The Court of Appeal stated:

> "Courts typically treat a probable cause hearing under the [SVPA] like a preliminary hearing in criminal cases. [Citation.] '[I]rregularities in the preliminary examination procedures which are not jurisdictional in the fundamental sense shall be reviewed under the appropriate standard of prejudicial error and shall require a reversal only if defendant can show that he was deprived of a fair trial or otherwise suffered prejudice as a result of the error at the preliminary examination.' [Citation.] Thus, irregularities in the probable cause hearing under the [SVPA] are subject to harmless error review as well.
>
> "We will not reverse a judgment or order based on an alleged error during the probable cause hearing unless the appellant makes a showing that he was denied a fair trial or otherwise suffered prejudice. [Citations.]" (*People v. Poulsom, supra,* 213 Cal.App.4th at p. 520.)

The court then turned to the question of prejudice. It stated:

> "The only prejudice Poulsom could argue that resulted from a finding of probable cause based on insufficient evidence is if the jury found Poulsom to be an SVP on the same insufficient evidence. However, certain safeguards make such a result unlikely.… [T]he court will only find probable cause if it determines 'a reasonable person could harbor a strong suspicion of the defendant's guilt ….' [Citation.] Once the case proceeds to trial, however, the burden of proof is on the People to show that the person is an SVP 'beyond a reasonable doubt.' [Citation.] Therefore, the increased burden of proof protects a defendant from a true finding based on evidence that would be insufficient to support a probable cause finding. Moreover, if a defendant believes the evidence supporting the jury's true finding is insufficient, he can raise the issue on appeal. Here, this is precisely what Poulsom did, essentially rendering his probable cause challenge moot." (*People v. Poulsom, supra,* 213 Cal.App.4th at pp. 521-522.)

Here, appellant does not challenge the sufficiency of the evidence presented at trial to support the trier of fact's finding that appellant is an SVP. That finding

25.

necessarily was based on appellant's *current* condition, i.e., current as of the time of trial. (See, e.g., *Moore v. Superior Court* (2010) 50 Cal.4th 802, 815, 817; *People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 922; *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1145.) The absence of rescreening or reevaluation to determine if he *might* be an SVP did not prejudice appellant.[11]

In *People v. Landau* (2013) 214 Cal.App.4th 1, the Court of Appeal assumed Landau was evaluated under the illegal pre-*Ronje* regulations, but nevertheless rejected his claim he was denied due process. (*People v. Landau*, at p. 16.) The court explained:

> "When a criminal defendant claims a procedural irregularity occurred prior to a determination of probable cause, the defendant must demonstrate prejudice to prevail on the issue in a postconviction setting unless the claimed error denied the court jurisdiction 'in the fundamental sense.' [Citation.] The same is true in SVP proceedings when it is claimed that an underground regulation was used in the prisoner's initial DMH evaluation. [Citation.]

> "A lack of fundamental jurisdiction '"means an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties." [Citation.]' [Citation.] The failure to use properly enacted regulations in the initial evaluation of a suspected SVP does not result in a lack of fundamental jurisdiction, depriving the court of jurisdiction over the subject matter or appellant. [Citations.]

> "Appellant was provided a full and fair trial on the petition.… After hearing all the evidence, the jury concluded beyond a reasonable doubt appellant qualified for commitment as an SVP. Appellant does not contend the evidence was insufficient to support that finding. Accordingly, we conclude appellant has failed to show he was prejudiced by the initial evaluators' use of unlawful underground regulations." (*People v. Landau, supra,* 214 Cal.App.4th at pp. 16-17.)

---

**11** It also disposes of appellant's complaint that treating the petition as still valid following parole revocation would mean he would not need to be reevaluated as an SVP if he were convicted of a new crime and sent to prison for 20 years while the petition was pending.

We conclude that where, as here, a valid commitment petition was pending trial at the time parole was revoked, failure to rescreen or reevaluate the alleged SVP does not constitute a lack of jurisdiction in the fundamental sense. We further conclude that where, again as here, the alleged SVP was provided a full and fair trial on the petition, and substantial evidence supports the trier of fact's determination that the individual is currently an SVP, the lack of rescreening or reevaluation does not, without more, result in prejudice.[12]

## II

### PSYCHOTHERAPIST-PATIENT PRIVILEGE

Appellant moved, in limine, to exclude as privileged, statements he made to mental health professionals during treatment. The People opposed the motion. After argument, the trial court ruled that statements made during the SVP screening and evaluation process were not privileged. Relying on *People v. Martinez* (2001) 88 Cal.App.4th 465 and *People v. Lakey* (1980) 102 Cal.App.3d 962, it further ruled that statements made at Shiloh — even those to treating psychotherapists — were admissible.

Appellant now contends the trial court erred by ruling that none of the Shiloh statements were privileged; and by failing to hold an Evidence Code section 402 hearing to determine exactly which statements were privileged, and then ordering the prosecution's experts not to consider those statements in forming their opinions and not

---

**12** Because we have addressed appellant's claim on the merits, his alternative argument that any forfeiture of the issue resulted from ineffective assistance of counsel is moot. To the extent appellant might be understood to contend that trial counsel was ineffective for failing to raise the lack of rescreening or reevaluation prior to trial, we reject the claim. Appellant has failed to establish deficient performance and prejudice. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003; *People v. Pope* (1979) 23 Cal.3d 412, 425; see generally *Strickland v. Washington* (1984) 466 U.S. 668, 687-694.)

to testify to matters related to or based upon those statements.[13] Appellant also says the statements were protected by his constitutional right to privacy. The Attorney General says the statements were not privileged because they fell within the "dangerous patient" exception to the psychotherapist-patient privilege.[14] The Attorney General further contends that if error occurred, it was harmless.

Subject to various exceptions, Evidence Code section 1014 establishes a privilege against disclosure for "confidential communication[s] between patient and psychotherapist." Such a communication "means information, including information obtained by an examination of the patient, transmitted between a patient and his psychotherapist in the course of that relationship and in confidence by a means which, so far as the patient is aware, discloses the information to no third persons other than those who are present to further the interest of the patient in the consultation, or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the psychotherapist is consulted, and includes a diagnosis made and the advice given by the psychotherapist in the course of that relationship." (*Id.*, § 1012.)

"[A] person seeking to invoke the psychotherapist-patient privilege has the initial burden of establishing the basic facts to show that the privilege is presumptively applicable — in general, that the person consulted constitutes a 'psychotherapist' and that the communication in question constitutes a '"confidential communication between

---

[13] Appellant does not challenge the trial court's ruling with respect to statements made to the SVP evaluators.

[14] Initially, the Attorney General also contended the statements were not privileged because they were contained within supporting documents relied on by the SVP evaluators. In response to our request for supplemental briefing concerning the effect of *People v. Gonzales* (2013) 56 Cal.4th 353 (*Gonzales*) on appellant's contentions, however, the Attorney General conceded *Gonzales* "appears" to "undercut[]" this argument.

patient and psychotherapist,"' within the meaning of the privilege. [Citations.] Once the patient has met that burden, the burden shifts to the party who contends that the privilege is inapplicable because one or more of the statutory exceptions applies. [Citation.]" (*Gonzales*, *supra*, 56 Cal.4th at p. 372.)

It appears appellant has carried his initial burden with respect to actual communications that were contained in the Shiloh discharge summary.[15] However, we believe there is merit in the Attorney General's claim that at least some of appellant's statements that were related in the discharge summary fell within the so-called dangerous patient exception to the privilege. In this regard, Evidence Code section 1024 provides: "There is no privilege under this article if the psychotherapist has reasonable cause to believe that the patient is in such mental or emotional condition as to be dangerous to himself or to the person or property of another and that disclosure of the communication is necessary to prevent the threatened danger." Here, some of appellant's statements clearly were disclosed near the time they were made, resulting in further investigation, the discovery of additional victims, further prosecution of appellant, and his termination from the group home.

"The 'dangerous patient' exception to the [psychotherapist-patient] privilege is narrow in the sense it only permits disclosure of those communications which triggered the psychotherapist's conclusion that disclosure of a communication was needed to prevent harm. [Citation.] However, Evidence Code section 1024 creates an exception to the privilege rather than anything akin to a waiver of the privilege. [Citation.] Hence when the factual predicate of the exception exists, an excepted communication may be used in any further proceeding, even though the threat identified by the psychotherapist no longer exists. [Citations.]" (*San Diego Trolley, Inc. v. Superior Court* (2001) 87

---

**15** Nothing in the record suggests there was any disclosure of Shiloh or other counseling or treatment records beyond the discharge summary itself.

29.

Cal.App.4th 1083, 1091-1092.) This includes SVPA proceedings. (See *Gonzales*, *supra*, 56 Cal.4th at pp. 380-381.)

In any event, if error occurred, it was harmless.[16] "[A]ssum[ing], *without deciding*, that in at least some circumstances the federal Constitution protects an individual from governmentally compelled disclosure of confidential communications between the individual and his or her psychotherapist or the use of information obtained by such compelled disclosure in a court proceeding" (*Gonzales*, *supra*, 56 Cal.4th at p. 385), appellant's federal constitutional right to privacy has not been violated here. Although appellant was not receiving therapy as a condition of parole, as was the defendant in *Gonzales* (see 56 Cal.4th at p. 386), he was in state custody and receiving mandatory counseling as a result of his wardship status. In contrast to the limited intrusion upon appellant's privacy interests occasioned by disclosure of the discharge summary, is "the substantial state interest that supports the disclosure and use of evidence relating to [a] defendant's mental state in an SVPA proceeding …." (*Id*. at p. 388; see *People v. Stritzinger* (1983) 34 Cal.3d 505, 511; *In re Lifschutz* (1970) 2 Cal.3d 415, 432; *People v. Martinez*, *supra*, 88 Cal.App.4th at pp. 478-480.) Accordingly, any error that occurred in the present SVPA proceeding by virtue of disclosure of appellant's statements in the discharge summary "constituted only state law error, and did not rise to the level of federal constitutional error. It follows that the applicable prejudicial error standard is the state law prejudicial error standard set forth in *People v. Watson* [(1956)]

---

[16] Since we reach this conclusion, we need not decide whether appellant's statements contained in the discharge summary may have been disclosable to the SVP evaluators — and, hence, admissible — under the provisions of section 6603, subdivision (c)(1) and *Albertson v. Superior Court* (2001) 25 Cal.4th 796, 804-807. In *Gonzales*, *supra*, 56 Cal.4th at pages 379-380, footnote 11, the California Supreme Court found it "not apparent" whether the Legislature intended the updated evaluations, for which that statute provides, "to include review of the records of *all* psychotherapy sessions in which a defendant has participated in the past when not subject to [SVP] confinement." (Italics added.)

46 Cal.2d 818[, 836]," i.e., "whether it is reasonably probable that a result more favorable to [appellant] would have been reached in the absence of the error." (*Gonzales*, *supra*, 56 Cal.4th at p. 388.)

In the present case, not everything contained in the discharge summary was necessarily privileged. Much of the information the SVP evaluators considered was contained in reports of various probation and police officers; appellant does not claim these individuals were "psychotherapists" for purposes of the psychotherapist-patient privilege. (See Evid. Code, § 1010.) The fact that additional victims were discovered, and charges brought, as a result of appellant's statements at the group home was not privileged. Significantly, although the SVP evaluators (including the evaluator who testified on appellant's behalf at trial) did consider the statements appellant made while at Shiloh, appellant admitted to Selby that he had eight victims, to Simon that he had nine victims, and in his trial testimony that he had 11 victims. The evaluators relied heavily on what appellant self-reported, as well as the circumstances of his offenses. We see no reasonable probability lowering the number of victims from 30 to between eight and 11, or excluding altogether appellant's statements, would have altered Selby's or Simon's conclusions, or, more importantly, the trier of fact's determination appellant was an SVP.[17]

### III

#### CONSTITUTIONALITY OF SVPA

Appellant contends the current version of the SVPA violates the ex post facto and double jeopardy provisions of the federal and state Constitutions, as well as his rights to due process and equal protection of law. He concedes the California Supreme Court has

---

[17]    Assuming the trial court abused its discretion by failing to hold an Evidence Code section 402 hearing to determine which, if any, statements were admissible (see *People v. Williams* (1997) 16 Cal.4th 153, 196-197), the error similarly was harmless.

ruled against him on his due process, ex post facto, and double jeopardy claims (*People v. McKee* (2010) 47 Cal.4th 1172 (*McKee I*), and that we are thus required to reject these claims (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455).[18]  He further concedes that upon remand in *McKee I*, the Court of Appeal in *People v. McKee* (2012) 207 Cal.App.4th 1325 (*McKee II*) ruled against his position on the equal protection issue.  He says, however, that *McKee II* was wrongly decided and so should not be followed.

In *McKee I*, the California Supreme Court observed that under the SVPA, as amended by Proposition 83 ("The Sexual Predator Punishment and Control Act: Jessica's Law") effective November 8, 2006 (the version under which appellant was committed), SVP's receive indeterminate commitments and, generally speaking, bear the burden of proving they should be released, while MDO's are committed for one year and thereafter have the right to be released unless the People prove beyond a reasonable doubt that the person should be recommitted for another year.  (*McKee I*, *supra*, 47 Cal.4th at pp. 1186-1187, 1202.)  The Supreme Court found that SVP's and MDO's are similarly situated for purposes of determining whether the fact one class bears a substantially greater burden in obtaining release from commitment than the other violates equal protection.  (*Id.* at p. 1203.)  The court stated:  "Because MDO's and SVP's have the same interest at stake — the loss of liberty through involuntary civil commitment — it must be the case that when society varies the standard and burden of proof for SVP's in the manner in which Proposition 83 did, it does so because of the belief that the risks

---

**18**     In reality, although *McKee I* rejected the due process and ex post facto arguments made by appellant (*McKee I*, *supra*, 47 Cal.4th at pp. 1193, 1195), the case did not directly address a claim the SVPA violates double jeopardy principles.  It did, however, find the SVPA not punitive. (*McKee I,* at p. 1195; see also *Hubbart v. Superior Court, supra,* 19 Cal.4th at p. 1175.)  In light of this determination, we agree with those cases that have rejected double jeopardy contentions.  (E.g., *People v. McDonald* (2013) 214 Cal.App.4th 1367, 1383; *People v. Landau, supra,* 214 Cal.App.4th at pp. 44-45.)

involved with erroneously freeing SVP's from their commitment are significantly greater than the risks involved with freeing MDO's. [Citation.] A substantial question is raised about the basis for this belief." (*Id*. at p. 1204, fn. omitted.) The court did not hold, as a matter of law, that there was no justification for the different treatment, but rather remanded the matter to give the People the opportunity to demonstrate a constitutional justification for the disparate treatment of SVP's and MDO's. (*Id*. at pp. 1207-1209.) It emphasized "that different classes of individuals civilly committed need not be treated identically" (*id*. at p. 1210), and that "mere disagreement among experts will not suffice to overturn the Proposition 83 amendments. The trial court must determine whether the legislative distinctions in classes of persons subject to civil commitment are reasonable and factually based — not whether they are incontrovertible or uncontroversial" (*id*. at pp. 1210-1211).

Upon remand, the trial court held a 21-day evidentiary hearing and concluded the People had met their burden of justifying the disparate treatment of SVP's. (*McKee II*, *supra*, 207 Cal.App.4th at p. 1330.) Division One of the Fourth District Court of Appeal affirmed, concluding "the trial court correctly found the People presented substantial evidence to support a reasonable perception by the electorate that SVP's present a substantially greater danger to society than do MDO's …." (*Id*. at pp. 1330-1331.)

The appellate court set out the strict scrutiny standard applicable to this type of equal protection claim, observed that the trial court employed that standard in holding the evidentiary hearing, and noted that the trial court, in its 35-page statement of decision, found the People had met their burden of establishing, by a preponderance of the evidence, that the disparate treatment of SVP's was based on a reasonable perception they posed greater and unique dangers compared to MDO's. (*McKee II*, *supra*, 207 Cal.App.4th at pp. 1332, 1335.) It then explained:

> "McKee asserts, and we agree, that we review de novo the trial
> court's determination whether the [SVPA], as amended by Proposition 83,

33.

violates his equal protection rights. We independently determine whether the People presented substantial, factual evidence to support a reasonable perception that SVP's pose a unique and/or greater danger to society than do MDO's …, thereby justifying the disparate treatment of SVP's under the [SVPA]. Although the trial court heard the testimony of many witnesses and received in evidence many exhibits, the instant constitutional question involved mixed questions of law and fact that are predominantly legal, if not purely legal questions, which are subject to de novo review. [Citations.] Furthermore, because in this case the trial court presumably did not decide any disputed historical facts, but determined only whether the People presented sufficient evidence to support a reasonable perception that SVP's pose a greater danger to society, we are in as good a position as the trial court to make that determination. Therefore, we apply an independent standard in reviewing the trial court's order rejecting McKee's equal protection claim.

"In independently reviewing the evidence admitted at the remand hearing, we must determine whether the People presented substantial evidence to support a reasonable inference or perception that the [SVPA's] disparate treatment of SVP's is necessary to further compelling state interests. [Citations.] … '[W]hen a constitutional right, such as the right to liberty from involuntary confinement, is at stake, the usual judicial deference to legislative findings gives way to an exercise of independent judgment of the facts to ascertain whether the legislative body "'has drawn *reasonable inferences based on substantial evidence*.'"' (*McKee* [*I*, *supra*, 47 Cal.4th] at p. 1206, italics added.) For evidence to be 'substantial,' it cannot be just 'any' evidence, but must be of ponderable legal significance, reasonable, credible, and of solid value. [Citation.] Furthermore, our power begins and ends with the determination whether there is substantial evidence, contradicted or uncontradicted, to support the legislative determination, and when two or more inferences can reasonably be deduced from the evidence, we are without power to substitute our deductions for those of the electorate or other legislative body. [Citation.]" (*McKee II*, *supra*, 207 Cal.App.4th at pp. 1338-1339, fn. omitted.)

The Court of Appeal proceeded to find the People had presented evidence (1) "showing the inherent nature of the SVP's mental disorder makes recidivism significantly more likely for SVP's as a class than for MDO's" (*McKee II*, *supra*, 207 Cal.App.4th at p. 1340); (2) "that the victims of sex offenses suffer unique and, in general, greater trauma than victims of nonsex offenses" (*id*. at p. 1342); and

34.

(3) "showing SVP's are significantly different from MDO's … diagnostically and in treatment" (*id*. at p. 1344).

The appellate court also rejected the defendant's argument the SVPA was unconstitutional unless it adopted the least restrictive means available to further the state's compelling interests. (*McKee II*, *supra*, 207 Cal.App.4th at pp. 1348-1349.) The court reviewed the pertinent authorities — including *McKee I* — and concluded: "[I]n strict scrutiny cases, the government must show both a compelling state interest justifying the disparate treatment *and* that the disparate treatment is necessary to further that compelling state interest. [Citations.] We are unpersuaded the electorate that passed Proposition 83 in 2006 was required to adopt the least restrictive means available (e.g., a two-year or other determinate term of civil commitment) in disparately treating SVP's and furthering the compelling state interests of public safety and humane treatment of the mentally disordered." (*McKee II*, at p. 1349.)

The California Supreme Court denied review of *McKee II* on October 10, 2012 (S204503).

Appellant now says *McKee II* was wrongly decided because (1) the *McKee II* court did not understand how to apply a strict scrutiny equal protection analysis, and (2) under the facts presented in the *McKee II* opinion, the court reached the wrong conclusion with respect to its equal protection analysis. Appellant further urges us to instruct the trial court in the present case to conduct its own hearing and permit appellant the opportunity to demonstrate why his equal protection rights have been violated even if McKee's were not.[19]

---

**19** Appellant's unopposed motion for judicial notice of the trial court's statement of decision in *McKee II* is granted. (Evid. Code, § 452, subd. (d); Cal. Rules of Court, rule 8.252.) To the extent appellant seeks judicial notice of the entire trial court record in *McKee II*, his motion is denied.

Every published opinion to consider the issue has concluded the current version of the SVPA passes constitutional muster under the strict scrutiny test, and has found *McKee II* persuasive. (*People v. Nguyen* (2013) 218 Cal.App.4th 1363, 1374-1378 [Fourth Dist. Court of Appeal, Div. 2]; *People v. McDonald, supra,* 214 Cal.App.4th at pp. 1371, 1376-1382 [Fourth Dist. Court of Appeal, Div. 3][20]; *People v. Landau, supra,* 214 Cal.App.4th at pp. 47-48 [Fourth Dist. Court of Appeal, Div. 3]; *People v. McCloud* (2013) 213 Cal.App.4th 1076, 1078-1079, 1085-1086 [First Dist. Court of Appeal, Div. 2]; *People v. McKnight* (2012) 212 Cal.App.4th 860, 862-864 [First Dist. Court of Appeal, Div. 3].) We agree. Accordingly, we reject appellant's claim the current version of the SVPA violates his federal and state equal protection rights.[21]

---

At oral argument, counsel for appellant sought to have us consider, in the context of his equal protection claim, an amendment to the SVP law that will take effect on January 1, 2014. We decline to do so. We are concerned with the constitutionality of the SVPA as it existed when appellant was adjudged an SVP, not the statutory scheme as it may exist in the future or a provision that may or may not be applied to appellant.

[20] *McDonald* expressly found the equal protection challenge was to be resolved on a classwide basis, rather than affording each potential SVP the right to present his or her own evidence on the matter. (*People v. McDonald, supra,* 214 Cal.4th at pp. 1377-1378.) The court further rejected the arguments the Court of Appeal in *McKee II* failed to conduct the required de novo review (*People v. McDonald*, at pp. 1378-1379), did not apply a true strict scrutiny standard (*id.* at pp. 1379-1380), and incorrectly assessed the evidence (*id.* at pp. 1380-1382).

[21] We specifically reject the following claim made in appellant's reply brief: "There are three elements that are under attack in this equal protection challenge. First, the indeterminate commitment; second, the shifting of the burden of proof at the … section 6608 proceeding; and, third, the elimination of the right to a jury trial at the [s]ection 6608 hearing. In order for the California SVP Law to withstand equal protection strict scrutiny analysis, each of these three elements must separately be found to be necessary to serve a compelling governmental interest."

Appellant cites no authority for this proposition. Moreover, as we previously stated, quoting *McKee II*, "We are unpersuaded the electorate that passed Proposition 83 … was required to adopt the least restrictive means available … in disparately treating SVP's and furthering the compelling state interests of public safety and humane treatment

36.

## DISPOSITION

The judgment is affirmed.

Appellant's motion for judicial notice of the trial court's statement of decision in *McKee II* is granted. To the extent appellant seeks judicial notice of the entire trial court record in *McKee II*, his motion is denied.

_____
                                                                DETJEN, J.

WE CONCUR:


_____
WISEMAN, Acting P.J.


_____
PEÑA, J.

---

of the mentally disordered." (*McKee II*, *supra*, 207 Cal.App.4th at p. 1349; accord, *People v. McDonald, supra,* 214 Cal.App.4th at p. 1380.)