Filed 12/5/22 P. v. Waters CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

|  |  |
|---|---|
| THE PEOPLE, | C094754 |
| Plaintiff and Respondent, | (Super. Ct. No. STK-MH-SVPR-2013-0000059) |
| v. | |
| TIMOTHY WATERS, | |
| Defendant and Appellant. | |

A jury found defendant Timothy Waters to be a sexually violent predator pursuant to the Sexually Violent Predators Act (SVPA). (Welf. & Inst. Code, § 6600 et seq.; statutory section citations that follow are found in the Welfare and Institutions Code unless otherwise stated.) Defendant contends insufficient evidence supports the verdict. He also argues the SVPA is not narrowly tailored to promote a compelling state interest in light of his claim there is a low probability he will reoffend based on his score on the Static-99R instrument. We affirm the judgment.

### FACTS AND HISTORY OF THE PROCEEDINGS

The prosecution filed a petition to commit defendant as a sexually violent predator. The trial court held a jury trial on the petition.

1

### A.     Criminal History

The parties stipulated defendant had qualifying convictions under section 6600 and was sentenced to determinate terms in prison. Defendant had five violations of parole after his 1987 conviction and prior to 2004. One of those violations was for failing to register as a sex offender.

Defendant's first conviction was for molesting the three-year-old daughter of his girlfriend's sister. Defendant told one of the examining psychologists he held her down and had intercourse with her.

Defendant's second and third convictions were for molesting a friend's two children: a nine-year-old boy and a 10-year-old girl.

Defendant self-reported that he molested another six-year-old girl in 2004 who was "coming up and asking him for sex every day." Defendant admitted he touched her buttocks and vagina.

### B.     Expert Testimony

The prosecution presented testimony from two licensed psychologists, Dr. Dana Putnam and Dr. Eric Simon.

Dr. Putman evaluated defendant seven times and each time found defendant met the criteria for a sexually violent predator. Defendant spoke with Dr. Putnam on four of those evaluations.

Dr. Putnam testified each of the above convictions were qualifying predatory offenses under section 6600.

Dr. Putnam also testified defendant had a mental health disorder of pedophilic disorder and alcohol use disorder. The doctor explained to the jury the basis for his diagnosis of defendant and opined his condition cannot be treated by medication and is a lifelong disorder. Specifically, Dr. Putnam testified defendant showed a clear demonstrated interest in pre-pubescent children based on the conduct forming the basis for his convictions and based on the doctor's review of documents found in defendant's

2

possession in prison. Those documents included about 200 pages of handwritten notes describing sex and violence with children, other printed documents, and pornographic images of adults. Dr. Putnam testified some of the handwriting was defendant's and he took special notice of those statements that contained graphic descriptions of defendant engaging in sexual acts with the six-year-old victim. Dr. Putnam testified he believed defendant authored these notes because defendant's name and signature appeared throughout the documents, and he was familiar with defendant's handwriting. The doctor found further evidence of defendant's interest in young girls in his attempt to order legal pornography depicting adult women as school girls while he was at the state hospital.

Dr. Putnam testified defendant demonstrated the inability to control his actions in such a way as to predispose him to committing violent sex offenses. Defendant had multiple rule infractions in prison which indicated his potential lack of cooperation with supervision. Defendant also had rule violations during his stay at the state hospital, including unauthorized possession of DVDs, and pruno (homemade prison alcohol). Dr. Putnam testified the diagnosis of defendant's alcohol use disorder is important because if defendant uses alcohol, he is more likely to act on his pedophilic urges.

Dr. Putnam also stated defendant's most recent answer regarding his release plan was to stay away from other people, get a job or recycle scrap metal, and register as a sex offender. Further, defendant did not believe he needed treatment; and would not voluntarily seek it out. Defendant did not have any family support if he was released. The doctor believed this created a risk of future criminal sexual behavior.

Dr. Putnam testified as to his understanding of the key criteria for proving defendant was a sexually violent predator: Is the person likely without appropriate treatment in custody to commit sexually violent predatory offenses in the future? Dr. Putnam testified, the term "likely" "was defined as a serious and well[-]founded risk." Dr. Putnam analogized the concept of the serious well-founded risk to the likelihood of a nuclear plant meltdown. He testified, "the number isn't the most

3

important thing, but whether it's a serious and well[-]founded risk. . . . I don't think anybody would accept a 5 percent risk that that would occur. [¶] We might look at something that has a risk that is well below 50 percent, but it may be it's 20 percent chance [*sic*] and you could say that that's a serious and well[-]founded risk in the event that you're looking at something of a very serious outcome."

Dr. Putnam testified he used the leading sex offender assessment tool, the Static-99R, as part of his evaluation of defendant. The Static-99R is an actuarial tool based upon static factors that do not change over time and produces estimated recidivism rates. Dr. Putnam explained to the jury how he came up with a total score of four. Generally, persons with a score of four have a 9.2 percent chance of being arrested or convicted of a new offense within the next five years or 13.9 percent within the next 10 years. This placed defendant in an above-average risk category. Dr. Putnam opined the actual figure is higher because the Static-99R only captures people with arrests and convictions and "[w]e know that we don't catch all sex offenses and we don't identify or know every time that someone has committed a sex offense." Defendant raised no objection to this testimony.

Dr. Putnam further testified about the other factors contributing to his opinion defendant's risk of reoffending was both serious and well-founded: (1) defendant's history of offending against young children, and (2) his fantasy life surrounding that deviance added to the seriousness and well-founded nature of the risk. He explained the nature of the written materials confiscated from defendant (which were in his handwriting) and the discussion of violent sexual fantasies with girls as young as three or four in age further compounded the re-offense risk.

In addition to the Static-99R, Dr. Putnam used dynamic factors to assess defendant's likelihood of recidivism. Dr. Putnam testified defendant's second offense after being convicted of the first offense put him at a much higher risk for offending again. Adding the particular dynamic risk factors to the defendant's Static-99R score,

4

Dr. Putnam concluded defendant's risk assessment is 13.6 percent over the next five years. His estimated lifetime risk was double his five-year risk or 27.2 percent.

In terms of factors that might reduce defendant's risk of reoffending (protective factors), the only one Dr. Putnam concluded applied was defendant was over 60 years old.

The prosecution's second witness, Dr. Simon, interviewed defendant once and diagnosed defendant with a pedophilic disorder, antisocial personality disorder, and alcohol use disorder. Dr. Simon concluded defendant demonstrated a multi-decade pattern of sexual interest in pre-pubescent children and acting on those interests. Like Dr. Putnam, Dr. Simon testified his diagnosis was supported by the 200 pages of handwritten stories found in defendant's locker in 2012 depicting sexual contact between adults and children. Dr. Simon concluded a person with both antisocial personality disorder and pedophilic disorder would have a bad combination of both a deviant sexual arousal pattern and disrespect for societal rules. To compound matters, defendant's alcohol use disorder reduces his impulse control.

Dr. Simon testified defendant's poor performance on probation and parole concerned him, especially the conviction for failing to register as a sex offender. Dr. Simon explained he believed defendant's mental health diagnosis was current due to defendant's many rule violations in prison. The data points supporting his diagnosis were the original conviction for molestation in 1986, the molestation of three more children in 2004, and defendant's possession of the deviant sexual writings in 2012. He testified he believed the diagnosis was current because the general consensus in psychology is this diagnosis does not go away with age and was further supported by defendant's attempt to order the three pornographic DVDs of adults dressed as Catholic high school girls while in the state hospital. He also testified defendant had impaired volitional capacity.

Dr. Simon used the Static-99R and explained his reasons for the score of five for defendant, placing him in the above-average risk category. He explained persons who

5

have that score are discovered to have committed a new sex offense about 19 percent of the time over the next 10 years. This percentage, however, represents only the chance of detection, not commission, of another offense and thus, represents a gross underestimate of the true sex offense recidivism rates. Defendant did not object to this testimony.

Dr. Simon believed defendant's strong sexual interest in children under the age of 14, his hypersexuality and sexual preoccupation, and his extensive criminal history (including his probation and parole violations), made him more of a risk than those who scored a five on the Static-99R instrument. Dr. Simon acknowledged the Static-99R instrument can be wrong about 30 percent of the time but noted it is the best instrument available.

Dr. Simon acknowledged defendant's significant medical conditions but testified none would bar defendant from using his hands, his mouth, or pulling a child onto his lap. Further, Dr. Simon noted defendant had no family contact or support. Defendant's plans to remain homeless and engage in scrap metal recycling appeared to Dr. Simon to set defendant up for failure and further criminal activities. Dr. Simon's opinion was defendant's low intellectual capacity would increase his risk of sex offense recidivism because he lacks the capacity to make good judgments.

In response, defendant presented the testimony of Dr. Brian Abbott, a licensed psychologist, and Dr. Alan Abrams, a medical doctor and attorney, as expert witnesses.

Dr. Abbott tested and found defendant to have a reading comprehension at the kindergarten level and word recognition at the first grade level. Based on these low levels, Dr. Abbott did not believe defendant wrote the materials found in his prison cell or had the ability to comprehend what was written. On cross-examination, he conceded defendant could have written some of the entries, and defendant admitted he dictated child pornography to a fellow inmate.

Dr. Abbott diagnosed defendant with post-traumatic stress disorder (PTSD) and alcohol use disorder due to his self-reported trauma in his childhood and being raped in

6

prison. Dr. Abbott opined defendant's child molestation was his "maladaptive way of coping with" recollections of his own prior circumstances of being sexually abused. Dr. Abbot testified defendant did not have serious difficulty in controlling his sexually violent behavior. Dr. Abbott also testified defendant's alcohol use disorder was in remission.

Dr. Abbott did not diagnose defendant with a pedophilic disorder because he believed there was no indication he exhibited sexual preference to young children. Dr. Abbott also rejected the contention defendant's attempt to order Catholic school girl videos was evidence of pedophilia because the actresses in those films would be developed women and not similar to pre-pubescent girls. Dr. Abbott also did not diagnose defendant with antisocial personality disorder.

Dr. Abbott scored defendant as a four on the Static-99R instrument. When asked about the reliability of the recidivism percentages of the Static-99R scores, Dr. Abbott agreed some sexual offenses go undetected and thus, there is "a kernel of truth" in the notion these percentages are understated. But Dr. Abbott believed there was no way to quantify this understatement. Dr. Abbott also testified he believed the Static-99R overestimates recidivism percentages because all sexual crimes, not just sexually violent crimes are counted in its analysis. Dr. Abbott expressed the opinion the 9.2 percent rate of recidivism predicted by the Static-99R might be subject to a margin of error of plus or minus 0.9 percent. Dr. Abbott testified it was his opinion the 9.2 percent probability estimate of the Static-99R instrument did not support defendant is "a substantial danger, that is a serious and well-founded risk to engage in sexually violent predatory acts."

Dr. Abrams, like the other doctors, concluded defendant was intellectually delayed.

Dr. Abrams echoed Dr. Abbott's diagnosis defendant had PTSD and alcohol abuse disorder. The doctor did not believe people with PTSD could achieve remission without intensive treatment, but people with alcohol abuse disorder could.

7

Dr. Abrams testified defendant did not suffer from a pedophilic disorder currently, but he likely would have fit that criteria in 1986 and 2004. He, too, believed the attempt to order the Catholic school girl videos was part of a normal adult sexual desire. Dr. Abrams did not review the written materials found in defendant's cell but testified it would surprise him to learn that the defendant had written them. He further admitted if the sexual materials were written by defendant, he would meet the criteria for pedophilia.

Dr. Abrams scored defendant as a three on the Static-99R instrument. He did not explain the basis for his score to the jury. Dr. Abrams agreed the Static-99R did not particularly answer the question posed by this case because it only gave the percentage of future arrests for anything considered sexually related. In the end, he did not believe defendant met the criteria to be committed under the SVPA.

Defendant did not testify on his own behalf.

The jury found defendant was a sexually violent predator under the SVPA. The trial court committed defendant to the State Department of State Hospitals for treatment and confinement for an indeterminate term.

Defendant timely appealed. The case was fully briefed on August 8, 2022, and assigned to this panel shortly thereafter.

### DISCUSSION

Defendant argues substantial evidence does not support the jury's finding he was a sexually violent predator "because the required finding that it was 'likely' that [defendant] would engage in sexually violent predatory criminal behavior unless confined within a secure facility was not proven beyond a reasonable doubt."

In particular, defendant argues, "An estimated five-year average recidivism rate of 9 percent and a ten-year average recidivism rate of 14 percent did not establish proof beyond a reasonable doubt [defendant] presented a substantial danger, defined as a serious and well-founded risk that [defendant] was likely to commit a sexually violent

8

predatory crime." He further asserts the SVPA denies him due process if those specific rates mean he is likely to engage in sexually violent predatory criminal behavior unless confined within a secure facility.

### A.    *The SVPA*

Under the SVPA, a " '[s]exually violent predator' " is "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a)(1).) The phrase " '[d]iagnosed mental disorder' " includes "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (§ 6600, subd. (c).)

To commit defendant as a sexually violent predator, the jury had to find defendant was previously convicted of a violent sexual offense and suffered from a mental disorder affecting his volitional or emotional capacity thereby making him a danger to others because he was likely to engage in sexually violent criminal behavior. (*People v. Poulsom* (2013) 213 Cal.App.4th 501, 517.)

The term " 'likely' " does not require a finding it is more likely than not the person will reoffend. (*People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 916 (*Ghilotti*).) Whether a person poses a "danger to the health and safety of others" (§ 6600, subd. (a)) "does not, by common understanding, evaporate with an expert's prediction that the sufferer's risk of reoffense is no greater than 50 percent." (*Ghilotti,* at p. 920, italics omitted.) At the same time, a finding of such danger requires "much more than the mere possibility that the person will reoffend." (*Id.* at p. 922, italics omitted.) Thus, the prosecution had to prove beyond a reasonable doubt at trial defendant "present[s] a substantial danger, that is, a serious and well-founded risk" defendant will commit such

crimes if released.  (*People v. Roberge* (2003) 29 Cal.4th 979, 988; §§ 6600, subd. (a), 6604.)

>    B.    *Sufficiency of the Evidence*

Defendant limits his challenge to the sufficiency of the evidence that it is likely he will engage in sexually violent criminal behavior.  Defendant focuses on the evidence establishing he was 9 percent likely to be charged or convicted of a sexual offense in the next five years and 14 percent likely over the next 10 years.

We review the sufficiency of the evidence in a sexually violent predator case under the same substantial evidence test used in criminal appeals.  (*People v. McCloud* (2013) 213 Cal.App.4th 1076, 1088.)  "In assessing the sufficiency of the evidence, [the court] review[s] the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."  (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)  Reversal for insufficiency of the evidence is warranted only if it appears that ' "upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*Ibid.*)

Here, all four experts used the Static-99R instrument as a starting point for their evaluations but disagreed as to whether defendant should receive a score of three, four or five.  The prosecution experts gave their expert opinion this instrument was merely a starting point, and the actual percentages were higher due to inherent measuring flaws with the test.  Even one of defendant's experts supported the opinion the Static-99R instrument percentage understated the probabilities of recidivism.  The other defense expert agreed the instrument did not specifically predict the nature of the risk being assessed here due to its limit to crimes that have been detected. The jury heard the basis for each doctor's opinion and were entitled to determine which testimony was credible.

From their baseline percentages, the prosecution's experts considered other dynamic factors, beyond those captured by the test, to evaluate defendant and shared their

thought processes with the jury. This evidence included the nature of the underlying crimes as demonstrating defendant's deviant interest in pre-pubescent children. It also included his inability to stop committing these sex crimes on children after his first arrest, and his fantasy life about sexual deviance with young girls as evidenced by his possession of writings at least partially in his handwriting of a deviant sexual nature, and his attempt to order adult pornography that depicted school girls.

Further, defendant had no real plan for reintegrating into society and no family or community support to keep him on the straight and narrow if he were to be released. Defendant's alcohol use disorder made it more likely he would reoffend, and his unwillingness to engage in any treatment for his admitted deviant behavior was another warning factor of his propensity to commit these same crimes in the future.

We conclude this evidence is reasonable, credible, and of solid value such that a reasonable jury could find beyond a reasonable doubt defendant will likely engage in sexually violent, predatory, criminal behavior if released. While the four experts provided differing opinions on this ultimate question, the jury was properly instructed the meaning and importance of the opinions were matters for them to decide. (See CALCRIM No. 332; Pen. Code, § 1127b.) The jury heard and saw their testimony and the facts upon which it was based. We conclude substantial evidence supported the jury's verdict.

### C. Speculation

Defendant's second argument is the jury could not credit the expert testimony that defendant's likelihood of committing a sexually violent crime was higher than the percentages suggested by the Static-99R instrument because it was based on speculation and unproven facts. He asserts the expert's opinion that defendant's actual likelihood of recidivism is higher is based on facts that cannot be before the court–because undetected offenses, by definition, are unknown.

11

"The Static-99 test is an actuarial instrument that allows an evaluator to place sexual offenders in different risk categories based on historical (static) factors such as age, marital status, the number of prior offenses, the relationship of the offender to the victims and the gender of the victims. After identifying the particular characteristics of the offender, the Static-99 test assigns a numeric score to them. The total score of the test is a percentage chance of the defendant's likelihood of being *convicted* for a future sexual offense." (*People v. Therrian* (2003) 113 Cal.App.4th 609, 612, italics added.) In *Therrian*, we upheld the use of the Static-99R test as <u>part</u> of a sexual violent predator evaluation and concluded the experts were properly allowed to testify about adjustments they made to the raw percentages provided by the test in making their assessment as to whether a defendant was likely to reoffend. (*Id.* at pp. 614, 616.)

As noted by the experts, the Static-99R provides an estimate of the chances defendant will be arrested or convicted of an offense. By definition, it does not estimate the chances a defendant will commit such an offense. The expert witnesses opined studies demonstrate many sexual offenses are unreported, and thus, they believe in their expert opinion the actual percentage is higher. Without objection, the experts testified to this sad reality and the other dynamic factors they included in their evaluation which raised the risk defendant would reoffend to an even higher level. To combat this expert testimony, defendant's own experts gave their opinion of the lack of probative and predictive value of the Static-99R instrument.

Because defendant did not challenge the admissibility of this evidence, or object to its use, he is left with the argument the prosecution's expert evidence was not entitled to any weight at all. The jury was properly instructed and was entitled to find the prosecution's experts more persuasive, and it did so. We find no error here.

### D.    *Due Process*

Defendant's final argument is that his right to due process is violated if the recidivism rates he attributes to the Static-99R instrument (9.2 percent and 13.9 percent)

12

are sufficient to commit him as a sexually violent predator. The answer to this argument is the evidence did not establish what defendant argues. The raw projections of the Static-99R instrument are estimates of whether similarly situated persons with the same score will be charged with or convicted of a subsequent sexual offense, not steadfast estimates of whether a particular defendant will actually commit one. Ultimately, the experts presented their opinions, starting with that recidivism rate and adding their analysis of other facts, and came to the reasoned conclusion that defendant is likely to engage in sexually violent predatory behavior without appropriate treatment in custody. Thus, defendant's argument misstates the evidence presented at trial supporting his commitment under the SVPA. The jury's determination based on the expert testimony presented did not violate defendant's right to due process because the statute is narrowly tailored to achieve the compelling governmental purpose of confining and treating sexually violent predators. (*Ghilotti, supra*, 27 Cal.4th at p. 973.)

### DISPOSITION

The judgment is affirmed.

_____,
HULL, Acting P. J.

We concur:

_____,
DUARTE, J.

_____,
KRAUSE, J.